**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| VETERANS FOR COMMON SENSE, a District of Columbia nonprofit organization; VETERANS UNITED FOR TRUTH, INC., a California nonprofit organization, representing their members and a class of all veterans similarly situated, | No. 08-16728<br><br>D.C. No. 3:07-cv-03758-SC |
| Plaintiffs - Appellants, | |
| v. | **OPINION** |
| ERIC K. SHINSEKI, Secretary of Veterans Affairs; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; JAMES P. TERRY, Chairman, Board of Veterans' Appeals; MICHAEL WALCOFF, Acting Under Secretary, Veterans Benefits Administration; BRADLEY G. MAYES, Director, Compensation and Pension Service; ROBERT A. PETZEL, M.D., Under Secretary, Veterans Health Administration; PRITZ K. NAVARA, Veterans Service Center Manager, Oakland Regional Office, Department of Veterans Affairs; UNITED STATES OF AMERICA; ERIC H. HOLDER, JR., Attorney General of the United States; BRUCE E. CASOLD, JR., Chief Judge of the United States Court of Appeals for Veterans Claims, | |

Defendants - Appellees,

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Argued August 12, 2009
San Francisco, California
Submitted September 14, 2009

Before: **KOZINSKI**, Chief Judge, **HUG** and **REINHARDT**, Circuit Judges.

Opinion by Judge Reinhardt

**REINHARDT**, Circuit Judge:

On an average day, eighteen veterans of our nation's armed forces take their own lives. Of those, roughly one quarter are enrolled with the Department of Veterans Affairs ("VA") health care system. Among all veterans enrolled in the VA system, an additional 1,000 attempt suicide each month. Although the VA is obligated to provide veterans mental health services, many veterans with severe depression or post-traumatic stress disorder ("PTSD") are forced to wait weeks for mental health referrals and are given no opportunity to request or demonstrate their need for expedited care. For those who commit suicide in the interim, care does not come soon enough. Like the cavalry of Alfred, Lord Tennyson's "Charge of

2

the Light Brigade," these veterans may neither "make reply" nor "reason why" to the "blunder" of those responsible for their safety.

Veterans who return home from war suffering from psychological maladies are entitled by law to disability benefits to sustain themselves and their families as they regain their health. Yet it takes an average of more than four years for a veteran to fully adjudicate a claim for benefits. During that time many claims are mooted by deaths. The delays have worsened in recent years, as the influx of injured troops returning from deployment in Iraq and Afghanistan has placed an unprecedented strain on the VA, and has overwhelmed the system that it employs to provide medical care to veterans and to process their disability benefits claims. For veterans and their families, such delays cause unnecessary grief and privation. And for some veterans, most notably those suffering from combat-derived mental illnesses such as PTSD, these delays may make the difference between life and death.

In this context, two non-profit organizations, Veterans for Common Sense and Veterans United for Truth (collectively "Veterans"[1]), seek injunctive and declaratory relief to remedy the delays in (1) the provision of mental health care

---

[1] We use the term Veterans to refer the two plaintiff organizations as well as to their members throughout.

3

and (2) the adjudication of service-connected death and disability compensation claims by the VA. Among other issues, Veterans ask us to decide whether these delays violate veterans' due process rights to receive the care and benefits they are guaranteed by statute for harms and injuries sustained while serving our country. We conclude that they do.

We do not reach this answer lightly. We would have preferred Congress or the President to have remedied the VA's egregious problems without our intervention when evidence of the Department's harmful shortcomings and its failure to properly address the needs of our veterans first came to light years ago. Had Congress taken the requisite action and rendered this case unnecessary even while it was pending before us, we would have been happy to terminate the proceedings and enter an order of dismissal. Alternatively, had the VA agreed with Veterans following oral argument to consider a practical resolution of the complex problems, the end result surely would have been more satisfactory for all involved. We joined in our dissenting colleague's suggestion that we defer submission of this case in order to permit the parties to explore mediation, and we regret that effort proved of no avail. We willingly acknowledge that, in theory, the political branches of our government are better positioned than are the courts to design the procedures necessary to save veterans' lives and to fulfill our country's

4

obligation to care for those who have protected us. But that is only so if those governmental institutions are willing to do their job.

We are presented here with the question of what happens when the political branches fail to act in a manner that is consistent with the Constitution. The Constitution affirms that the People have rights that are enforceable against the government. One such right is to be free from unjustified governmental deprivation of property – including the health care and benefits that our laws guarantee veterans upon completion of their service. Absent constitutionally sufficient procedural protections, the promise we make to veterans becomes worthless. When the government harms its veterans by the deprivations at issue here, they are entitled to turn to the courts for relief. Indeed, our Constitution established an independent Judiciary precisely for situations like this, in which a vulnerable group, that is being denied its rights by an unresponsive government, has nowhere else to turn. No more critical example exists than when the government fails to afford its injured or wounded veterans their constitutional rights. Wars, including wars of choice, have many costs. Affording our veterans their constitutional rights is a primary one.

There comes a time when the political branches have so completely and chronically failed to respect the People's constitutional rights that the courts must

be willing to enforce them. We have reached that unfortunate point with respect to veterans who are suffering from the hidden, or not hidden, wounds of war. The VA's unchecked incompetence has gone on long enough; no more veterans should be compelled to agonize or perish while the government fails to perform its obligations. Having chosen to honor and provide for our veterans by guaranteeing them the mental health care and other critical benefits to which they are entitled, the government may not deprive them of that support through unchallengeable and interminable delays. Because the VA continues to deny veterans what they have been promised without affording them the process due to them under the Constitution, our duty is to compel the agency to provide the procedural safeguards that will ensure their rights. When the stakes are so high for so many, we must, with whatever reluctance, fulfill our obligation to take this extraordinary step.[2]

We affirm the district court's rulings with respect to Veterans's various claims for specific forms of relief under the Administrative Procedure Act, including their claims for system-wide implementation of various VA mental health care initiatives and their claims for the alteration of disability compensation

---

[2] We emphasize that we are presented with grave questions of life and death, and fundamental structural problems with the government's fulfillment of its duty to veterans. This is a serious matter, which deserves to be taken seriously, rather than as an opportunity to employ military metaphors in a failed effort to entertain the reader.

adjudication procedures in VA regional offices. We conclude, as did the district court, that the relevant provisions of the Administrative Procedure Act prevent us from granting Veterans the statutory relief that they seek. We reverse, however, the district court's rulings on Veterans's constitutional claims. We hold that the VA's failure to provide adequate procedures for veterans facing prejudicial delays in the delivery of mental health care violates the Due Process Clause of the Fifth Amendment, and that the district court erred when it found otherwise. We further hold that the district court erred in concluding that it lacked jurisdiction to review Veterans's due process challenge to delays and procedural deficiencies in the compensation claims adjudication system, and that it erroneously denied Veterans the relief to which they are entitled under the Due Process Clause. We therefore affirm the district court in part, reverse in part, and remand for further proceedings.

## BACKGROUND

There are approximately 25 million veterans in the United States. As of May 2007, roughly one-quarter of them were enrolled for health care with the VA,[3]

---

[3] The district court found these facts. We take judicial notice of the more current official figures provided by the VA: 23 million veterans, of whom one-third (8 million) are now enrolled for health care with the Veterans Health Administration, and of whom 3 million receive disability benefits. *See* VA

(continued...)

7

the mission of which is "to fulfill President Lincoln's promise 'To care for him, who shall have borne the battle and for his widow and for his orphan' by serving and honoring the men and women who are America's veterans."[4] The VA has three branches: the Veterans Health Administration ("VHA"), the Veterans Benefits Administration ("VBA"), and the National Cemetery Administration ("NCA"). This case involves statutory and constitutional challenges to the actions of two of those branches, the VHA and the VBA.

## I.     Veterans Health Administration

Under Chapter 17 of Title 38 of the United States Code, veterans have a statutory entitlement to hospital care and other medical services. *See* 38 U.S.C. § 1710. This care is provided by the Veterans Health Administration. The VHA is required by law to provide free medical care to all veterans who served in any conflict after November 1, 1998, for up to five years from the date of separation from military service for any medical condition, even if the condition is not attributable to military service. 38 U.S.C. §§ 1710(e)(3)(C)(i); 1710(e)(1)(D).

---

[3](...continued)
Benefits & Health Care Utilization (July 30, 2010), *available at* http://www1.va.gov/VETDATA/Pocket-Card/4X6_summer10_sharepoint.pdf.

[4] United States Department of Veterans Affairs, Mission Statement, *available at* http://www4.va.gov/about_va/ mission.asp.

Medical services that the VHA is required to provide to veterans include "medical examination, treatment, and rehabilitative services." 38 U.S.C. § 1701(6).

The VHA is also required, by statute, to provide readjustment counseling and related mental health care services to eligible veterans. *See* 38 U.S.C. § 1712A. The Secretary of Veterans Affairs is required to "furnish counseling to the veteran to assist the veteran in readjusting to civilian life. Such counseling may include a general mental and psychological assessment of the veteran to ascertain whether such veteran has mental or psychological problems associated with readjustment to civilian life." 38 U.S.C. § 1712A(a)(1)(A). If a veteran requests a "general mental health assessment" the VA must provide such an assessment "as soon as practical after receiving the request, but not later than 30 days after receiving the request." 38 U.S.C. § 1712A(a)(3). If the physician or psychologist who conducts the mental health evaluation determines that the veteran requires mental health services "to facilitate the successful readjustment of the veteran to civilian life" the veteran shall be "furnished such services." 38 U.S.C. § 1712A(b)(1).

The VHA provides healthcare services to veterans via 21 regional Veterans Integrated Service Networks, which administer 153 VA hospitals (or medical centers), approximately 800 community-based outpatient clinics, and 200

9

Readjustment Centers (or "Vet Centers") throughout the United States. The Secretary is required by statute to ensure that this health care system is "managed in a manner to ensure that the provision of care to enrollees is timely and acceptable in quality." 38 U.S.C. § 1705(b)(3).

Most veterans enrolled with the VA receive medical care at the VHA's community-based outpatient clinics. These clinics do not provide mental health care services, even though an unprecedented number of newly-discharged veterans have been diagnosed as suffering from mental disorders, in particular PTSD, as a result of military service in Iraq or Afghanistan. Approximately one out of every three soldiers returning from Iraq was seen in a VHA facility for mental health related treatment within a year of his return to the United States. The total number of patients is high; since October 2001, more than 1.6 million military personnel have served in Iraq or Afghanistan, and as of the end of 2007, over 800,000 veterans of the wars in Iraq and Afghanistan were eligible for VA health care.

PTSD is a leading mental health disorder diagnosis for those veterans.[5] According to Dr. Arthur Blank, a psychiatric expert who testified before the district

---

[5] As the Commander-in-Chief recently acknowledged, PTSD is one of the two "signature wounds of today's wars." President Barack Obama, Remarks by the President in Address to the Nation on the End of Combat Operations in Iraq (Aug. 31, 2010).

court, this disorder is a "psychological condition that occurs when people are exposed to extreme, life-threatening circumstances, or [when they are in] immediate contact with death and/or gruesomeness, such as [what] occurs in combat, severe vehicular accidents or natural disasters. It produces a complex of psychological symptoms which may endure over time." Those symptoms include anxiety, persistent nightmares, depression, uncontrollable anger, and difficulties coping with work, family, and social relationships. From 2002 to 2003 there was a 232 percent increase in PTSD diagnoses among veterans born after 1972. A 2008 study by the RAND Institute shows that 18.5 percent of U.S. service members who have returned from Iraq and Afghanistan currently have PTSD, and that 300,000 service members now deployed to Iraq and Afghanistan "currently suffer PTSD or major depression." Delays in the treatment of PTSD can lead to alcoholism, drug addiction, homelessness, anti-social behavior, or suicide.

Veterans in general face a heightened risk of suicide. Studies show that suicide rates among veterans are much higher than among the general population. One such study considered by the district court, the "Katz Suicide Study" of February 2006, found that suicide rates among veterans were approximately 3.2 times higher than among the general population. The author of that study, a senior physician and administrator at the VHA, also estimated that "[t]here are about 18

11

suicides per day among American's 25 million veterans" and that there are four to five suicides per day among veterans currently receiving treatment from the VA. Dr. Katz subsequently noted that the VHA's "suicide prevention coordinators" had identified approximately 1,000 suicide attempts per month among the veterans treated in VHA medical facilities.

In July 2004, the VA developed and adopted a five-year Mental Health Strategic Plan to improve the provision of mental health care services. One of its core objectives was to "[r]educe suicides among veterans." In May 2007, however, the VA Office of Inspector General ("OIG") issued a report concluding that many components of the Mental Health Strategic Plan, including those relating to suicide reduction, had not been implemented. Moreover, the district court record shows that even in areas in which the VA has attempted to follow the Mental Health Strategic Plan, the measures introduced have fallen short of the Plan's express goals. For example, the Plan called for thorough mental health screening for "[e]very returning service man/woman . . . as part of the post-deployment and separation medical examination." Mental health screening is now a component of the primary health care examination when veterans first enroll in the VA, but that screening is not rigorous and does not always evaluate veterans' risk of suicide. Although veterans are screened for PTSD, depression, traumatic

brain injury, military sexual trauma, and problem drinking, their risk of suicide is

not automatically assessed. All veterans who specifically present[6] with mental

health or addiction disorders are screened for suicide risk, but just two questions

are asked:

> (1) "During the past two weeks, have you felt down, depressed, or
> hopeless?"

> (2) "During the past two weeks, have you had any thoughts that life
> was not worth living or any thoughts of harming yourself in any
> way?"

Veterans who answer "yes" to the first question, but "no" to the second question

are not given any further suicide risk screening, unless they are being admitted to

an inpatient psychiatric unit.[7]

The May 2007 OIG report concluded that there was a widespread absence of

effective suicide prevention measures at VHA facilities. The report found that 61.8

percent of VHA facilities had not introduced a suicide prevention strategy to target

veterans returning from Iraq and Afghanistan and that 42.7 percent of such

---

[6] The intransitive verb "present" is used by healthcare professionals to mean "to come before a physician (with a particular symptom, medical history, etc.)" Webster's New World College Dictionary (2010).

[7] Although the record does not state explicitly that those who answer "no" to both questions also receive no further treatment, even if they experienced frequent suicidal impulses previously, we note that this is also a logical inference.

facilities had not introduced a program to educate first-contact, non-medical

personnel about how to respond to crisis situations involving veterans at risk for

suicide.  This report also found that 70 percent of VHA facilities had not

introduced a system to track veterans who presented risk factors for suicide and

16.4 percent of VHA facilities had not implemented a medical referral system for

veterans with risk factors.  By 2009, each of the 153 VHA Medical Centers had a

suicide prevention officer, charged with overseeing the clinical care of at-risk

patients.[8]  There were, however, no suicide prevention officers at any of the

approximately 800 community-based outpatient clinics, where most veterans

receive their medical care.

The effect of VHA's failure to implement a systematic program designed to

reduce veterans' risk of suicide has been magnified by its failure to adopt measures

to ensure that veterans with mental health disorders are swiftly identified and

offered treatment.  As the district court found, the May 2007 OIG report identified

significant delays that prevented veterans from obtaining timely physician referrals

for the treatment of depression and PTSD.  For example, the report found that

where a primary care provider refers a veteran suffering from depression with

---

[8] The district court noted that these officers receive just two and one half days of special training for their role.

symptoms of moderate severity, only 40 percent of VA facilities reported a same-day evaluation, whereas 24.5 percent of VA facilities reported a waiting period of two to four weeks, and 4.5 percent of facilities reported a waiting period of four to eight weeks. Similarly, only 33.6 percent of VA facilities reported same-day evaluation for individuals referred with symptoms of PTSD, while 26 percent reported wait times of two to four weeks, and 5.5 percent reported wait times of four to eight weeks. These extensive waiting times can have devastating results for individuals with serious mental illnesses.

The VA has acknowledged the crucial importance of timely clinical treatment for individuals with mental illnesses, and the district court record is replete with examples of statements, both written and oral, by senior VHA physicians and administrators underscoring the importance of timely medical care. One such example is a memorandum written by William Feeley, who, until April 2009, was the Deputy Under Secretary for Health Operations and Management at the VHA. In June 2007, he issued a memorandum instructing the directors of all 21 Veterans Integrated Service Networks to begin implementing the specific initiatives set forth in the 2004 Mental Health Strategic Plan, including those guaranteeing timely mental health treatment. The memo instructed that a veteran who presents with mental health issues for the first time at a medical center or

15

community-based outpatient clinic should be evaluated within 24 hours. It also provided that a veteran who seeks an appointment for mental health issues should be given a follow-up appointment within 14 days. Yet, VA administrators testified before the district court during the 2009 trial that they had no reports showing that either initiative mentioned in the Feeley memo had been implemented system-wide. Indeed, the district court found that as of April 2008, approximately 85,450 veterans remained on VHA waiting lists for mental health services.[9]

Veterans suffering from mental illnesses who are told that they must wait for extended periods of time before receiving treatment have little recourse. A veteran has neither the right nor the opportunity to appeal an *administrative* decision to place him on a wait list, if that decision is made by a clerical appointment scheduler such as a medical center receptionist. By contrast, a veteran may appeal a doctor or nurse's *clinical* decision that he must wait for a certain period of time before receiving mental health care. To do so, he must complain to a so-called "Patient Advocate," an employee of the VHA Medical Center at which the veteran

---

[9] These numbers may, however, significantly under-represent the number of veterans actually awaiting mental health care. During the trial before the district court, the chief medical officer of the Veterans Integrated Service Network in the Great Lakes Region testified that, in his region, a veteran was only placed on the wait list for a mental health appointment after he had *already* waited for 30 days to see a mental health professional.

was treated who is a colleague of the doctor or nurse who placed the veteran on the wait list. The Patient Advocate logs the veteran's complaint in a database and refers the complaint to the Medical Center's Chief of Staff, who must decide how to respond to the complaint within seven days. If the veteran disagrees with the Chief of Staff's decision, he may further appeal to the Director of the Veterans Integrated Service Network, who makes a final decision on the veteran's complaint. If the veteran disagrees with the Director's decision, he may ask the Director to request an external review. The veteran himself may not request such a review; only the Director may do so. Moreover, even if the Director does request an external review, the veteran has no right to know the results of that review. The veteran's only way to independently learn the outcome of an external review is to file request under the Freedom of Information Act.

## II.    Veterans Benefits Administration

The Veterans Benefit Administration is the branch of the VA responsible for veterans' benefits programs, including pensions and "Service-Connected Death and Disability Compensation" benefits. Veterans with service-connected disabilities – *i.e.*, disabilities that are the result of a disease or injury incurred through, or aggravated during, active military service – are entitled to monetary benefits as compensation. *See* 38 U.S.C. § 1110; 38 C.F.R. § 3.303(d).

17

Approximately 3.4 million veterans currently receive monetary benefits from the VBA. The district court found that many recipients of service-connected death or disability compensation benefits are totally or primarily dependent upon those benefits for financial support. The application procedures for such benefits are complex, and the district court found that, in light of statistics showing the limited formal education of the majority of recent veterans, many of them may have difficulty applying for the benefits to which they are entitled without substantial third-party assistance.

## A

The labyrinthine process of applying for benefits from the VBA begins at one of the 57 VA Regional Offices located throughout the United States. To apply for service-connected disability compensation benefits, a veteran must complete a 23-page application and submit it to the VA Regional Office in his area. In support of his application, the veteran must present evidence of his disability, service in the military that would entitle him to benefits, and a nexus between the disability and the military service.[10]

---

[10] A veteran whose claim includes PTSD must additionally provide proof of a "stressor" event that occurred during his military service. *See* 38 C.F.R. § 3.304(f)(1) ("if the evidence establishes that the veteran engaged in combat . . . and the claimed stressor is related to that combat, in the absence of clear and

(continued...)

The Veterans Claims Assistance Act, 38 U.S.C. § 5103, states that the VBA has a "duty to assist" veterans, requiring it to aid them in developing all evidence in support of their disability claims. Under the Act, upon receipt of a veteran's benefits claim application, a VBA Veterans Service Representative must contact the veteran and notify him of any further evidence that the VBA requires in order to adjudicate the claim. *Id.* The Veterans Service Representative must send the veteran a "duty to notify letter" detailing what information the veteran is expected to provide and what evidence the VBA will seek on his behalf under the Veterans Claims Assistance Act. In accordance with its "duty to assist" under the Act, the VBA must seek all government records that may pertain to the claim, including, *inter alia*, service personnel and medical records, VA medical records, and social

---

[10](...continued) convincing evidence to the contrary . . . the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor.") According to Ronald Aument, formerly Deputy Under Secretary for Benefits, this additional requirement renders PTSD-based disability benefit claims among the most difficult claims that the VA adjudicates. Specifically, the district court found that veterans often make mistakes completing their application forms and submitting evidence in support of their disability claims, and veterans suffering from PTSD had a particularly hard time furnishing the information properly. We note, however, that the VA recently amended its regulations "by liberalizing in some cases the evidentiary standard for establishing the required in-service stressor" to make it simpler for veterans to file claims for PTSD based on stressors "related to the veteran's fear of hostile military or terrorist activity." Stressor Determinations for Posttraumatic Stress Disorder, 75 Fed. Reg. 39,843, 39,843 (July 13, 2010); *see* 38 C.F.R. § 3.304(f)(3) (2010).

security records. The "duty to assist" also requires the VBA to undertake "reasonable efforts" to acquire non-federal records, most notably private medical records identified by the veteran, if the veteran furnishes the VBA with a signed release form. Veterans have 60 days to respond to the "duty to notify letter" and to furnish the VBA with any applicable releases.

Section 5103A of the Veterans Claims Assistance Act states that the VBA's "duty to assist" also includes "providing a medical examination or obtaining a medical opinion when such an examination or opinion is necessary to make a decision on the claim." 38 U.S.C. § 5103A. This medical examination is intended to confirm that a disability exists and to assess the medical implications of that disability in order to assist the claim adjudicator in determining the percentage the veteran will be considered disabled pursuant to the VBA's rating schedule. The VBA arranges and pays for Compensation and Pension Examinations, and the current wait time for such examinations is approximately 30-35 days. Individuals who have been treated for a recognized disability, such as PTSD, at a VHA medical facility may nonetheless be required to undergo a Compensation and Pension Examination. Moreover, a veteran who has been previously diagnosed by a physician at a VHA medical center as having PTSD, may nonetheless be

diagnosed as not having PTSD during a VBA Compensation and Pension Examination.

Once all of the evidence in support of a veteran's service-connected disability compensation benefits claim has been gathered, a Rating Veterans Service Representative (known as a "rating specialist") decides whether the veteran's disability is service connected, and, if it is, assigns a rating to his claim. Approximately 88 percent of all ratings claims are at least partially granted. The rating given operates on a sliding scale from zero percent disabled to 100 percent disabled, with increases at ten percent increments. Compensation currently ranges from $123 per month for a ten percent rating to $2,673 per month for a 100 percent rating. 38 U.S.C. § 1114.

During the pendency of a veteran's claim to his local VBA Regional Office, he is statutorily barred from paying a lawyer to represent him. *See* 38 U.S.C. § 5904. He may, however, be represented by a pro bono attorney or a representative from a Veterans Service Organization – a non-profit organization that is dedicated to working on behalf of veterans.[11]

---

[11] VSOs are not affiliated with the VA. The district court found that in some cases, the VA provides VSOs with office space in its VBA Regional Offices, computer systems, and access to VA databases. The court also found, however, that the VA does not provide training to VSOs regarding how to assist veterans,

(continued...)

If a veteran disagrees with the rating accorded him by the ratings specialist in his local Regional Office he may appeal. The multi-phase appeals process is, however, extremely difficult to navigate, especially for those suffering from mental disabilities such as PTSD, and embarking upon an appeal may delay a veteran's receipt of benefits for many years.

A veteran may initiate his appeal of a rating specialist's rating decision by filing an informal Notice of Disagreement with his local Regional Office, or by filing a direct appeal to the Board of Veterans' Appeals with that Regional Office. A Notice of Disagreement may be filed within one year of the issuance of the VBA Regional Office's ratings decision. The veteran may appeal any part of the rating decision, including the denial of a ground of disability, the percentage of the disability assigned to the veteran, or the effective date of the disability. During the appeals process, the veteran's record remains open, and the veteran may submit additional evidence at any time.

When a Regional Office receives a Notice of Disagreement from a veteran it sends the veteran an election letter asking the veteran to choose between two non-exclusive appeals processes: (1) *de novo* review of his claim by a Decision Review

_____

[11](...continued)
and that all of the VSOs combined cannot meet the needs of all the veterans seeking benefits.

Officer (a senior ratings specialist) who is empowered to reverse the initial rating decision if he believes that it is not warranted; or (2) issuance of a Statement of the Case by the Regional Office, providing a more detailed rationale for the underlying ratings decision, to be used in a formal appeal to the Board of Veterans' Appeals. *See* 38 U.S.C. § 7105. A veteran is entitled to retain paid counsel at this stage of the proceedings. *See* 38 U.S.C. § 5904.

If the veteran elects *de novo* review by a Decision Review Officer, and that officer resolves some, but not all of the appeal, or if the officer fails to resolve the appeal, a Statement of the Case will be prepared and the veteran may pursue a formal appeal to the Board of Veterans' Appeals. If the veteran decides to file a formal appeal with the Board, the veteran must file a VA Form 9 with his local Regional Office within 60 days of receiving the Regional Office's Statement of the Case, or within a year of receiving the Regional Office's rating decision, whichever is longer. *See* 38 U.S.C. § 7105(d)(3). The Regional Office must then certify the veteran's appeal to the Board of Veterans' Appeals. 38 C.F.R. § 19.35.

A veteran who disagrees with the Board's decision can further appeal the decision to the Court of Appeals for Veterans Claims ("Veterans Court"), an independent Article I court created by the Veterans' Judicial Review Act of

23

November 18, 1988, Pub. L. No. 105-687.[12]  A veteran claimant must file a notice of appeal with the Veterans Court within 120 days of the Board of Veterans' Appeals' final decision.  38 U.S.C. § 7266(a).  He may then further appeal an adverse decision by the Veterans Court to the U.S. Court of Appeals for the Federal Circuit, which has authority to "decide all relevant questions of law,"  38 U.S.C. § 7261(a), and he may ultimately petition for certiorari in the Supreme Court of the United States.

**B**

More than 830,000 ratings claims are filed with the VBA each year.  On April 12, 2008, there were 400,450 claims for service-connected death and disability compensation pending before the VBA.  The district court found that approximately 11 percent of all ratings claims lead to a Notice of Disagreement being filed by a veteran and four percent of all ratings claims proceed to an appeal to the Board of Veterans' Appeals.

Throughout the appeals process, veterans (or their surviving relatives) seeking service-connected death and disability compensation are constrained by various time limits, and a failure to timely file at any point in the process can result

---

[12]  The Court of Appeals for Veterans Claims has seven judges, who are appointed by the President and confirmed by the Senate to serve a fifteen-year appointment.

in forfeiture of the appeal.[13]  In contrast, the VBA is not subject to any statutory or regulatory time limits at any step of the process.

Veterans experience long delays in the consideration and adjudication of service-connected death and disability claims, particularly when such claims are appealed.  The VBA's stated goal is to process all initial ratings claims within 125 days.  The district court found, however, that it takes, on average, 182 days for a regional office to issue an initial decision on a veteran's claim for service-connected death and disability compensation.  Indeed, as of April 12, 2008, there were 101,019 rating-related claims that had been pending for over 180 days.  The district court found that, because of the inherent complexities in proving a PTSD diagnosis, service-connected death and disability compensation claims that are based on PTSD take longer to adjudicate than other "average" claims.

In cases in which a veteran files a Notice of Disagreement with a Regional Office, the district court found that in 2008 it took approximately 261 days for a Regional Office to mail a Statement of the Case to the veteran.  In some cases,

_____

[13] Following the Supreme Court's recent decision in *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197 (2011), the 120-day deadline within which veterans may file an appeal from the Board of Veterans' Appeals to the Veterans Court is no longer treated as jurisdictional.  *Id.* at 1206.  The deadline is nevertheless strict, and it remains unclear whether it is subject to equitable tolling or any other exception.  *Id.* at 1206 & n.4.

veterans had to wait more than 1,000 days for the Regional Office to issue the Statement of the Case. The district court found that upon receipt of the Statement of the Case, it took the veteran 43 days, on average, to file a Form 9 substantive appeal. The district court then found that it took 573 days, on average, for the Regional Office to certify an appeal to the Board of Veterans' Appeals upon receipt of the veteran's Form 9 – a merely ministerial act. Some veterans have had to wait more than 1,000 days for the Regional Office to certify their appeal to the Board.

The district court found that veterans who appeal directly to the Board wait, on average, 336 days for the Board to issue a decision in their cases. Some veterans elect to have a hearing – at their own expense – in front of a Board of Veterans' Appeals judge. Those veterans who receive hearings are more likely to prevail on their appeal, but they must wait an average of 455 days for that hearing.

For veterans who pursue an appeal by filing a Notice of Disagreement with the Regional Office's initial decision, seeking a Statement of the Case, and then file an appeal with the Board, the district court found that it takes on average 1,419 days (3.9 years) from the veteran's initial filing of the Notice of Disagreement to the veteran's receiving a decision from the Board. It therefore takes approximately 4.4 years from the date of the veteran's initial filing of a service-connected death

26

and disability compensation claim to the final decision by the Board (not including any time that may have elapsed between the Regional Office's initial rating decision and the veteran's filing of his Notice of Disagreement, which may be up to one year).

During the district court proceedings in this case, senior VA officials were questioned about the extraordinary delays in the VBA's claims adjudication appeal system. None of those officials, however, was able to provide the court with a sufficient justification for the delays incurred. Bradley Mayes, the Director of Compensation and Pension Services at the VBA, testified at a deposition that the VBA had not "made a concerted effort to figure out what [wa]s causing" the lengthy delays in its resolution of the appeals of veterans claims for service-connected death and disability compensation. And at trial, James Terry, the Chairman of the Board of Veterans' Appeals, was unable to explain the lengthy delays inherent in the appeals process before the Board.

The record before the district court suggests that errors made by ratings specialists at the Regional Office level play a significant role in the lengthy delays that veterans experience in the adjudication of their claims. On average, the Board affirms a Regional Office's disposition of a case only 40 percent of the time, grants a veteran's appeal 20 percent of the time, and remands the case to the VBA for

further proceedings in 40 percent of cases. Between 19 and 44 percent of these remands are so-called "avoidable remands," defined as occurring when "an error is made by the R[egional] O[ffice] before it certifies the appeal to the B[oard]." The district court found that almost half of the "avoidable remands" between January 1, 2008, and March 31, 2008, occurred as a result of violations by VBA employees of their duty to assist veterans. Approximately 75 percent of the claims that are remanded by the Board of Veterans Appeal are subsequently appealed to the Board a second time. The district court found that it takes the Board, on average, 149 days to render a second decision on a claim that it has already remanded once to the VBA.

The district court found that, following remand, it takes the VBA an average of 499.1 days to grant or withdraw a service-connected death and disability compensation claim, or to return it once again to the Board. It takes even longer, on average, for PTSD claims to be processed on remand – 563.9 days. Many veterans suffering from serious disabilities, including PTSD, suffer substantial and severe adverse consequences as a result of this lengthy delay. In just the six months between October 2007 and April 2008, at least 1,467 veterans died during the pendency of their appeals.

III. **History of the Case**

On July 23, 2007, Veterans for Common Sense and Veterans United for Truth filed a complaint in the district court seeking declaratory and injunctive relief, on behalf of themselves, their members, and a putative class composed of all veterans with PTSD who are eligible for or receive VA medical services, and veteran applicants for and recipients of service-connected death or disability compensation benefits based upon PTSD. In the complaint, Veterans raised numerous statutory and constitutional challenges to the procedures the VA employs in its provision of health care services and adjudication of benefits claims.[14]

With respect to the VHA's duty to provide veterans with mental health care, the Veterans challenged the following VHA practices and procedures, which, they claim, violate veterans' statutory entitlements and constitutional right to due process:

> (1) VHA mental health care waiting lists are extremely long, resulting in lengthy delays and in some cases "the absence of any care," and there are no transparent procedures in place for a veteran to appeal his placement on such a waiting list

> (2) Mental health care is unavailable or inaccessible at some VHA facilities and there are no procedures in place to improve accessibility

---

[14] Not all of these claims are maintained on appeal, and this opinion addresses only those that are.

(3) The VHA has no procedure through which Veterans can obtain expedited relief in urgent cases such as an imminent suicide threat

(4) The VHA had delayed implementing governmental recommendations for improve procedures pertaining to clinical care and education

With respect to the VBA's duty to provide veterans with service-connected death and disability benefits, the Veterans challenged the constitutionality of the following VBA practices and procedures:

(1) The VBA acts as both the trier of fact and adversary at the Regional Office stage of the adjudication of claims for service-connected death and disability compensation claims

(2) There are no neutral judges or trial-like procedures at the VBA Regional Office stage of the adjudication of claims for service-connected death and disability compensation claims

(3) There is no procedure through which veterans may obtain discovery to support SCDDC claims

(4) There is no procedure whereby a veteran might compel the attendance of any VA employees or most other witnesses to testify and support their claims at service-connected death and disability compensation claim hearings

(5) There is no class action procedure available in front of the VA

(6) The Veterans Court has a limited role and is unable to award injunctive or declaratory relief

(7) There is no judicial authority or mechanism to enforce judicial decisions or to require the agency of original jurisdiction (the Regional Offices of the VBA) to obey or comply with the rule of law

(8) The attorney's fee prohibition of 38 U.S.C. § 5904(c)(1) and the related provision for criminal penalties, 38 U.S.C. § 5905 prejudice veterans by curtailing their ability to bring suit

Veterans therefore sought declaratory and injunctive relief. Veterans asked the district court to declare, among other things, that:

(1) The challenged VA practices, including the lack of procedures to remedy delays in the provision of medical care and treatment, violate Veterans's right to due process

(2) Veterans are not barred from pursuing remedies in the federal courts

(3) The VA has a mandatory obligation to provide medical care to returning veterans under 38 U.S.C. § 1710(e)(1)(D)

Veterans sought to compel the VA to:

(1) Implement the recommendations of the Mental Health Strategic Plan

(2) Implement the recommendations of the Feeley Recommendation

(3) Provide free medical care to all returning veterans for the maximum period specified in 38 U.S.C. § 1710(e)(1)(2) (5 years)[15]

(4) Expand the VHA clinical appeals process to allow for appeals of administrative scheduling delays for the provision of mental health care

And Veterans sought to enjoin the VA from:

---

[15] Veterans's complaint states that this period is "two years." The statute, however, specifies that the relevant period is five years. *See* 38 U.S.C. § 1710(e)(1)(D), (e)(3)(C)(i). The district court correctly found "that this language create[s] an entitlement to health care for veterans for five years after separation from active duty."

(1) Permitting very protracted delays in the provision of medical care to individuals with PTSD and in the adjudication of PTSD benefits claims

(2) Destroying, altering, or doctoring records in veterans' claim files

(3) Prematurely denying PTSD and other service-connected death and disability compensation claims

(4) Allowing Washington, DC-based officials to assert extra-judicial pressure and influence upon the adjudication of individual claims by VA Regional Offices

The VA filed a motion to dismiss, which the district court denied. After Veterans moved for a preliminary injunction on their mental health care claims, the district court held an evidentiary hearing. Instead of ruling on the motion for a preliminary injunction, the district court deferred its ruling and merged the hearing with a trial on the merits, which began six weeks later. The trial addressed both Veterans's mental health care claims and their compensation adjudication claims.

Veterans objected to the expedited trial schedule and limitations on discovery, and the district court overruled the objections. To meet the advanced trial date, the district court created a modified, expedited discovery schedule. On appeal, Veterans challenge two discovery rulings – one relating to the production of suicide incident briefs and the other relating to an interrogatory concerning the average length of time to process a PTSD compensation claim at the initial Regional Office level – which are addressed further in the Analysis, *infra*.

32

Veterans argue that, in each instance, they were substantially prejudiced by the district court's ruling.

The district court held a seven-day bench trial. Two months later, the district court issued a thorough Memorandum of Decision, Findings of Fact and Conclusions of Law. *Veterans for Common Sense v. Peake*, 563 F. Supp. 2d 1049 (N.D. Cal. 2008). The district court concluded that Veterans had standing to bring suit on behalf of their members, because the interests at stake in the case were germane to the purposes of both organizations, both organizations' members had suffered injuries in fact, there was a causal connection between the injuries and the VA's conduct, and the relief sought would likely result in the amelioration of the injuries. 563 F. Supp. 2d at 1077 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).[16]

_____

[16] We agree with the district court's conclusion on this point, and the government does not challenge it. Veterans' members would individually have standing; the "interests [they] seek[] to protect are germane to the organization[s'] purpose[s]"; and because their challenge is a systemic one seeking prospective relief – not an attack on past, individual benefits determinations – "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

We note that in a recent case, the D.C. Circuit concluded that a different veterans' organization did not have standing to bring a suit against the VBA on

(continued...)

33

behalf of its members because the suit expressly sought judicial review of "the average processing time at each stage of the claims process." *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 662 (D.C. Cir. 2010). The D.C. Circuit, noting that "an association has standing to sue only if one member would have standing on his or her own right," interpreted the organization's claim as not seeking relief for an injury to any individual member of the organization, because "the average processing time does not cause affiants injury; it is only their processing time that is relevant." *Id.*

Here, by contrast, Veterans complain of a variety of injuries actually being experienced or likely to be experienced in the near future by their members, including stalled disability claims pending in the VBA, and mental health that is deteriorating in the absence of treatment by the VHA. They allege that those injuries are caused by the VA's systemic failures, particularly the lack of adequate procedures for processing veterans requests for health care from the VHA or claims adjudication by the VBA, and that appropriate procedural safeguards would redress their members' injuries by ensuring that the services and benefits to which they are entitled are delivered before it is too late – *i.e.*, before their illnesses worsen or result in their deaths, and before their families are financially ruined. Veterans do rely upon average waiting times, among much other data and evidence, to *illustrate* those failures, but, unlike in *Vietnam Veterans*, Veterans do not allege that the "average" wait times themselves cause their members' injuries. Rather, they argue that it is the absence of constitutionally required procedural safeguards that causes those injuries and the high risk of future injury. In a suit for prospective relief, that potential for immediate harm is sufficient to establish organizational standing. *See, e.g.*, *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names [of individual members] because *every* member faces a probability of harm in the near and definite future.") (emphasis added). Veterans may represent their members interests now; individual members need not wait to bring individual claims until it is too late to obtain meaningful relief. *Cf. Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) ("[Plaintiff organizations] have not identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers, but this is understandable . . . . [A] voter

(continued...)

34

The district court nonetheless denied each of Veterans's claims. With respect to their APA challenge to the VHA's untimely and/or ineffective healthcare appeals procedures and the inadequacies of the implementation of the Mental Health Strategic Plan, the court concluded that Veterans's claim did not pertain to a discrete, "final agency action," and thus it could not be raised under the APA. *See* 5 U.S.C. §§ 704, 706(1); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004). Moreover, the court found that 38 U.S.C. § 1710 "commits decisions about the provision of medical care to the Secretary's discretion," and that "courts [have] no meaningful standards against which to judge the agency's exercise in discretion." Finally, the court found insufficient evidence of system-wide delays in the provision of mental health care to support a determination that agency action was "unreasonably delayed" under the APA, even if the VA's action were reviewable.

[16](...continued)
cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is inevitable, however, that there will be such mistakes. The issues [plaintiffs] raise are not speculative or remote; they are real and imminent."). Veterans have simply done a better job alleging the facts required to establish their standing than did the plaintiff organization in *Vietnam Veterans*.

The district court further ruled that it did not have jurisdiction to order the VA, within 150 days, to fully implement the Mental Health Strategic Plan, because Veterans's request was barred by the APA for three separate reasons. First, the district court considered Veterans's complaint to be one pertaining to the manner and speed with which the plan had been implemented – the sufficiency of an agency action, rather than a complaint about the agency's failure to act. Second, because the MHSP "consists of 265 recommendations" the district court found it "dubious" that it could be characterized as "discrete agency action" and found that such "recommendations" were not "actions the VA 'is required to take.'" Third, and finally, the district court found that as the MHSP was a five-year plan and was, at the time of the court's ruling, in its fourth year of implementation, it was still ongoing, and thus was not a final agency action. The district court used the same rationale to reject Veterans's request that it order the VA to fully implement the recommendations of the Feeley memo within 150 days.

As to Veterans's due process challenge to the VHA's failure to provide timely care, the district court found no constitutional violation. It reasoned that while veterans presenting with mental health emergencies are not treated immediately "every time," Veterans "did not prove a systemic denial or unreasonable delay in mental health care." The court deemed adequate the VA's

36

clinical appeals process, which struck "an appropriate balance between safeguarding the veteran's interest in medical treatment and permitting medical treatment without overly burdensome procedural protections."

The district court also denied each of Veterans's claims pertaining to benefits adjudication. The district court concluded that 38 U.S.C. § 511 prevented it from reviewing delays in the adjudication of individual veterans' claims, and "the issue of whether a veteran's benefits claim adjudication has been substantially delayed will often hinge on specific facts of that veteran's claim." Furthermore, it concluded that if it were to provide the injunctive relief that Veterans sought, including ordering the VBA to shorten its average wait times, "such an order would invariably implicate VA regulations," which are subject to judicial review in the Federal Circuit only under 38 U.S.C. § 502.

The district court further concluded that neither the delays in adjudicating service-connected death and disability compensation benefits claims, nor the lack of procedural protections for individuals making such claims, was unreasonable under the APA or violative of due process. While the court found these delays "significant" and did not "dispute that the health and welfare of veterans is at stake," it determined that it could not find the delays "unreasonable" under the APA because Congress had established no specific timetable for claims

37

adjudication and because the delays resulted, in part, from "the VA's decision to emphasize initial claim adjudication at the expense of appeals." Finally, the court found no due process violation because "'[d]elay is a factor but not the only factor'" in "'determining when due process is no longer due process because past due.'" (Quoting *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978)).

Ultimately, the district court concluded that the remedies sought by Veterans were beyond its power "and would call for a complete overhaul of the VA system, something clearly outside of this Court's jurisdiction." The district court therefore denied Veterans's request for a permanent injunction, and granted judgment in favor of the VA. Veterans timely appealed.[17]

**ANALYSIS**

**I**

---

[17] The district court denied Veterans's request for injunctive relief based upon its answers to questions of law, so we review its decision *de novo*. *See Gathright v. City of Portland*, 439 F.3d 573, 576 (9th Cir. 2006). We rely on the facts as they were found by the district court, except to the extent those findings were clearly erroneous. *Preminger v. Peake*, 552 F.3d 757, 765 n.7 (9th Cir. 2008).

We begin by confirming our jurisdiction to hear Veterans's constitutional claims.[18]

## A.    Sovereign Immunity

By seeking an injunction against the VA and its agencies, Veterans have brought suit against the federal government.  The federal government has historically enjoyed immunity from suit, notwithstanding that the principle of sovereign immunity derives from the English legal notion that "the King can do no wrong"; this surely was not a principle that those who fought for our country's independence happily imported into our legal system.  Nevertheless, it is well-established that "the United States cannot be lawfully sued without its consent in any case." *United States v. Lee*, 106 U.S. 196, 205 (1882).  The VA does not assert that it is immune from suit over Veterans's constitutional claims, but we address the issue because the district court determined that sovereign immunity precluded consideration of those claims.

We hold that sovereign immunity does not bar adjudication of Veterans's constitutional claims, because Congress has expressly waived such immunity.  The second sentence of § 702 of the APA states:

---

[18] For the reasons that are set forth below, the agency actions Veterans challenge under the Administrative Procedure Act are not reviewable under the terms of that statute, so we need not consider other bars to review of those claims.

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. As the Supreme Court has held with regard to this provision, "complaints [for] declaratory and injunctive relief [are] certainly not actions for money damages." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Veterans's prayers for declaratory relief and an injunction thus fit squarely within this waiver.

The district court nonetheless found that "waiver of sovereign immunity under § 702 of the APA is limited by § 704." Section 704 states, in relevant part, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." The district court reasoned that because the delays Veterans challenge are neither made reviewable by any statute nor a "final agency action," even their constitutional claims fall outside of § 702's waiver of sovereign immunity. This was error. Whether the challenged delays constitute "final agency action" is an inquiry that is relevant to Veterans's claims under the APA itself, which are addressed below. But § 704 in no way limits § 702's broad waiver of sovereign immunity with respect to suits for injunctive relief against the federal government – suits for which the APA itself is not the cause of action.

40

In *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), we held that "§ 702's waiver of sovereign immunity is [not] limited to instances of 'agency action'" as defined by the APA. *Id.* at 525. We found that the *first* sentence of § 702 *does* address "agency action" specifically: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. But we determined that the waiver of sovereign immunity in the second sentence, which was added to the statute in 1976, "contains no such limitation."[19] *Presbyterian Church*, 870 F.2d at 525. To the contrary,

---

[19] Reviewing the legislative history of the 1976 amendment, we explained:

Congress observed that before the amendment to § 702, litigants seeking such nonmonetary relief were forced to resort to the "legal fiction" of naming individual officers, rather than the government, as defendants an approach that was "illogical" and "becloud[ed] the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate." The need to channel and restrict judicial control over administrative agencies, Congress concluded, could better be achieved through doctrines such as statutory preclusion, exhaustion, and justiciability, rather than through "the confusing doctrine of sovereign immunity." Accordingly, § 702 was designed to "eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency."

(continued...)

41

"[n]othing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of 'agency action.'" *Id.* We therefore found that sovereign immunity had been waived as to the Church's First and Fourth Amendment challenges to surveillance conducted by the Immigration and Naturalization Service in its congregations, even though the INS's investigations did not constitute "agency action" under the APA. *Id.*

The district court noted, however, that nine years after *Presbyterian Church*, we stated summarily: "[T]he APA's waiver of sovereign immunity contains several limitations. Of relevance here is § 704, which provides that only '[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court, are subject to judicial review.'"[20] *Gallo Cattle Co. v. Department of Agriculture*, 159 F.3d 1194, 1198 (9th Cir. 1998). But it is *Presbyterian Church* and not *Gallo Cattle* that controls where, as here, a plaintiff's

---

[19](...continued)
*Presbyterian Church*, 870 F.3d at 524 (internal citations and footnote omitted) (citing H. Rep. No. 1656, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6123–6130). We assumed that the "legal fiction" referred to by Congress was that created by *Ex parte Young*, 209 U.S. 123 (1908), and its progeny. *Presbyterian Church*, 870 F.3d at 524 n.7.

[20] *Gallo Cattle* did not cite *Presbyterian Church* or any other authority for this holding.

42

challenge is constitutional and thus not dependent on the APA for a cause of action.

The first and second sentences of § 702 play quite different roles, each one significant. The first sentence entitles aggrieved individuals to "judicial review of federal agency action." The second sentence, added to the statute decades later, waived sovereign immunity for "[a]n action in a court of the United States seeking relief other than money damages . . . ." One such action, of course, is a suit for "judicial review of federal agency action" of the sort authorized by the first sentence. But other actions exist too. Injunctions may be sought, for example, to enforce the Constitution itself; courts need no statutory authorization to undertake constitutional review. *See, e.g.*, *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . .").

*Gallo Cattle* considered a challenge to an agency order denying the plaintiffs preliminary relief while they adjudicated the merits of their petition before an administrative board – that is, interim relief to which the plaintiffs believed themselves entitled by *statute* and the agency's regulations.[21] *Id.* at 1198–1200.

---

[21] The plaintiff's claim on the *merits* before the administrative board concerned a First Amendment challenge. *Gallo Cattle*, 159 F.3d at 1196. That

(continued...)

The plaintiffs sought "judicial review of agency action" not because it was unconstitutional, but because it violated the rules governing the agency. For that type of suit, the plaintiffs' cause of action was the APA itself, so we applied § 704's limitation on what agency action is reviewable – meaning subject to "judicial review" under the first sentence of § 702 – and concluded that because § 704's terms were not satisfied, the *first* sentence of § 702 did not authorize judicial review. Consequently, sovereign immunity could not be waived because the plaintiffs failed to bring a cognizable "action" in court. *Id.* at 1198 (addressing the "waiver of sovereign immunity in *suits seeking judicial review of a federal agency action* under [28 U.S.C.] § 1331") (emphasis added)).

As in *Presbyterian Church*, the plaintiffs here raise a constitutional challenge, which does not depend on the cause of action found in the first sentence of § 702. Section 704's limitation of that first sentence is thus inapplicable, and the district court's reliance on *Gallo Cattle* was incorrect.[22] Instead, because

---

[21](...continued) claim was not before the court, however. The plaintiffs appealed only from the agency's denial of its request "to pay [the challenged] assessments into escrow pending a decision on the merits of the petition" – a matter solely of the agency's procedure for adjudicating disputes through its administrative process. *Id.*

[22] While incorrect, the district court's confusion was reasonable. The district court cited *Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006), a prior decision of this court that discussed both *Presbyterian Church* and *Gallo*

(continued...)

Veterans have brought "[a]n action in a court of the United States seeking relief other than money damages" that arises under the Constitution itself, as in *Presbyterian Church*, we find that sovereign immunity has been waived by § 702's second sentence.

We find additional support for this conclusion in a decision of the D.C. Circuit that rejected similar arguments to those made by the government and accepted by the district court here. In *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006), that court declined to adopt the FTC's position that "(1) the waiver [of sovereign immunity under § 702] applies only to actions arising under the APA; and (2) since review under APA § 704 is limited to 'final agency action,' the waiver of sovereign immunity is similarly restricted to conduct that falls within that compass." *Id.* at 186. Undertaking an analysis identical to ours in *Presbyterian Church*, the court determined that "nothing in the language of the second sentence of § 702 . . . restricts its waiver to suits brought under the APA,"

---

[22](...continued)
*Cattle* and observed in passing that it "saw no way to distinguish" the two cases. *Id.* at 809. The *Gros Ventre Tribe* court ultimately resolved the case on other grounds. For the reasons just provided, we find *Presbyterian Church* and *Gallo Cattle* readily distinguishable: *Presbyterian Church* concerns § 702's waiver of sovereign immunity as to constitutional challenges, while *Gallo Cattle* concerns challenges under the APA itself. Section 704 constrains only the latter situation, and it is the former type that we are presented with here.

45

and thus the waiver applied to the plaintiff's First Amendment claim there. *Id.*

Moreover, the court "h[e]ld that the waiver applies regardless of whether the

[agency's challenged conduct] constitutes 'final agency action'" under § 704. *Id.*

at 187 (citing *Presbyterian Church*, 870 F.2d at 525). This is consistent with our

holding that § 702's waiver of sovereign immunity applies more broadly than to

actions under the APA itself. We therefore hold that, as to Veterans's

constitutional claims for "relief other than money damages," § 702 waives

sovereign immunity regardless of whether the claims arise from "agency action" as

defined by the APA.[23]

## B.      The Veterans Judicial Review Act

The Veterans Judicial Review Act ("VJRA") prohibits judicial review of

"the decision of the Secretary [of Veterans Affairs] as to any" "question[] of law

and fact necessary to a decision by the Secretary under a law that affects the

provision of benefits by the Secretary to veterans or the dependents or survivors of

veterans." 38 U.S.C. § 511(a). The VA argues that this provision precludes us

from considering Veterans's second constitutional challenge, concerning the

---

[23] We note that even if we did not find a waiver of sovereign immunity here, Veterans's constitutional challenge could proceed against all individual defendants under *Ex Parte Young* – precisely the fiction for which Congress sought to eliminate the need in adding the second sentence of § 702.

46

procedure for the adjudication of claims for disability benefits. The dissent goes even further and suggests that the VJRA forecloses our ability to decide Veterans's first constitutional challenge, regarding delays in mental health care services, as well. We disagree as to both challenges, and shall explain why below in the context of each claim.

## II

We first address Veterans's statutory and constitutional claims concerning the delays in VHA's provision of mental health care. The number of veterans diagnosed as suffering from mental illnesses, and the percentage of those who are awaiting treatment, is simply staggering. As of April 2008, at least 85,450 veterans were languishing on VHA waiting lists for mental health care – a number that may significantly under-represent the scale of the problem both then and now.[24] The urgent need to provide veterans with the mental health care to which they are entitled is clear, not least in light of the high suicide rate among this vulnerable population. In the absence of procedures designed specifically to safeguard veterans' rights to timely, effective treatment, veterans are suffering and dying, heedlessly and needlessly.

---

[24] As noted earlier, *supra* note 9, some veterans are not even placed on formal waiting lists until they have already waited for a month.

Veterans contend that the introduction of a formal appeals process to allow a veteran to contest an administrator's decision to place him on a waiting list for mental health care, of more transparent clinical appeals procedures, and of a procedure permitting veterans with PTSD to seek expedited access to mental health care in acute cases, would save lives. The district court ruled that Veterans have no recourse in the federal courts to contest the VA's systematic failure to provide veterans with procedures safeguarding their access to the mental health care to which they are statutorily entitled. In some respects, the district court is correct. In others, it erred in so ruling. Although our power is limited under the APA and we cannot grant Veterans the relief they seek as to their statutory challenge, we hold that their constitutional right to due process has been violated, reverse the district court's ruling in this respect, and remand this appeal for further proceedings.

## A.    APA Challenge to Mental Health Care Delivery Delays

Given the provisions of the APA and controlling Supreme Court law, the district court properly denied Veterans's APA challenge to the VHA's delays in providing timely and effective mental health care, notwithstanding the many evident deficiencies in the VHA's provision of such care.

Under the APA, courts are empowered to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In *Norton v. Southern*

48

*Utah Wilderness Alliance*, however, the Supreme Court interpreted the scope of this statutory provision and held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." 542 U.S. 55, 64 (2004). With regard to the discreteness requirement, the Court stated that the "failure to act" is "properly understood as . . . a failure to take one of the agency actions (including their equivalents) earlier defined in [5 U.S.C.] § 551(13)." *Id.* at 62. Agency actions defined in 5 U.S.C. § 551(13) include issuance of a rule, order, license, sanction, relief or equivalent benefit. The *Norton* Court suggested that, for example, "the failure to promulgate a rule or take some decision by a statutory deadline" would constitute the failure to take a discrete agency action. *Norton*, 542 U.S. at 63.

An agency action may therefore be reviewed and compelled by a federal court under § 706(1) only if that action is one which is legally required. *Id.* Quoting the Attorney General's Manual on the APA, the *Norton* Court stated "§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). In limiting APA review to required agency actions,

the Court held, Congress "rule[d] out judicial direction of even discrete agency action that is not demanded by law" under the APA. *Id.* at 65.

Veterans assert here that the VA has unreasonably delayed the provision of timely and effective mental health care to eligible veterans by failing to implement the Mental Health Strategic Plan and the Feeley Memorandum. Implementation of the Plan and Memorandum would undoubtedly improve the lot of veterans who are suffering unduly as a result of delays in the provision of their mental health care. Such implementation does not, however, fall within the definition provided by the Supreme Court in *Norton* of a "discrete action" that the agency is "required" to take, because no statute or regulation demands it. Veterans contend that the VA is statutorily required to provide timely and acceptable medical care under 38 U.S.C. § 1710(a) and 38 U.S.C. § 1705. True, but those requirements are not so specific as the particular action Veterans seek to compel.

In relevant part, 38 U.S.C. § 1710 requires that the VA furnish hospital care and medical services to certain veterans:

> The Secretary . . . shall furnish hospital care and medical services which the Secretary determines to be needed—
>
> (A) to any veteran for a service-connected disability; and
>
> (B) to any veteran who has a service-connected disability rated at 50 percent or more.

38 U.S.C. § 1710(a)(1). Veterans "who served on active duty in a theater of combat operations . . . after November 11, 1998" are eligible for health care and services for five years following discharge. 38 U.S.C. § 1710(e)(1)(D), (e)(3)(C)(i). Section 1705(a) then obligates the Secretary "[i]n managing the provision of hospital care and medical services under section 1710(a)" to prescribe, establish, and operate a system of annual patient enrollment. In designing this "enrollment system," the Secretary "shall ensure that the system will be managed in a manner to ensure that the provision of care to enrollees is timely and acceptable in quality . . . ." 38 U.S.C. § 1705(b)(1).

Veterans claim that § 1705(a) creates an obligation to ensure that the VHA as a whole is managed so as to provide timely care of acceptable quality. We agree. We disagree, however, with Veterans's contention that this statutory obligation mandates the implementation of the Mental Health Strategic Plan and the Feeley Memorandum, which Veterans characterize as the VA's "own determination of what § 1710 requires." Such a reading overstates the reach of the specific provisions of § 1705 – particularly in light of the fact that Veterans have not filed any direct challenge to the Secretary's management of the enrollment system itself.

The VA does not dispute that the it is required to provide mental health care to certain veterans. Nor should it dispute that a delay in providing necessary mental health care would amount to a wholesale failure to provide care to at-risk veterans under § 1710 and § 1705, insofar as some at-risk veterans will take their own lives during the delay. The VA is, thus, obviously required to take action to ensure that, system-wide, mental health care is provided to at risk veterans in a timely manner. There is, however, no statutory language that would specifically obligate the VA to fully implement the remedies sought by Veterans – the Mental Health Strategic Plan or the Feeley Memorandum. We are therefore bound by the Supreme Court's instruction in *Norton* that: "General deficiencies in compliance, unlike the failure to issue a ruling . . . lack the specificity requisite for agency action." *Norton*, 542 U.S. at 66.

As the *Norton* Court recognized, however, agencies may be required to take actions not only by Congress, but also by themselves. Agency action "demanded by law . . . includes, of course, agency regulations that have the force of law." *Norton*, 542 U.S. at 65. Even a less formal agency "plan" may "itself create[] a commitment binding on the agency," if there is "clear indication of binding commitment in the terms of the plan." *Id.* at 69, 71. Thus we have held that "agencies may be required to abide by certain internal policies," such as their own

52

"internal procedures." *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004) (citing *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

Veterans argue that the Mental Health Strategic Plan and Feeley Memorandum are such required internal policies. But neither document supports that view. The Plan was designed to "identif[y] overlap, include[] gap analyses, and present[] goals and objectives that articulate a set of proposed strategies that directly support all the mental health needs of the enrolled veteran population." The VA cast the Plan's particular strategies as "recommendations." Nowhere did the agency commit to binding itself, and we do not find any implied intent to do so.

The Feeley Memorandum, by contrast, does impose the affirmative obligation that procedures to ensure veterans receive mental health evaluations within twenty-four hours of seeking help "must be implemented by August 1, 2007." But the memorandum – a document sent from the Deputy Under Secretary for Health for Operations and Management to the VA's Network Directors – is an internal administrative communication that lacks the force of law. *See Rank v. Nimmo*, 677 F.2d 692, 698-99 (9th Cir. 1982). Unlike an internal rule that is officially published within an agency and binding on its employees, for example, the Memorandum is merely a charge from a supervisor to his subordinates.

53

Veterans's APA claim concerning timely and acceptable mental health care therefore cannot proceed because Veterans do not assert that the VA "failed to take a *discrete* agency action that it is *required to take*" within the meaning of § 706(1), *Norton*, 542 U.S. at 64, and so we affirm the district court's ruling on Veterans's APA-based challenge.

## B. Due Process Clause Challenge to Mental Health Care Delivery Delays

Veterans also claim that the lack of adequate procedures to ensure that veterans will not suffer needlessly because of severe delays in the receipt of mental health care violates the Due Process Clause of the Fifth Amendment. We agree.

**1**

We first consider whether the VJRA deprives us of jurisdiction to consider this claim. We note at the outset that while the VA argues vigorously that the VJRA forecloses our consideration of Veterans's second due process claim, regarding the disability benefits adjudication process, it does not contend that it affects *this* claim at all. To the contrary, the VA acknowledges that "the general nature of plaintiffs' claims – which asserted 'systemic' delays in the provision of health care" – falls outside the VJRA's jurisdictional bar to "challenges to the medical care or other benefits provided in *specific* cases." Gov't Br. 33 n.7. A potential jurisdictional flaw is not a litigant's issue to waive, of course, so we must

54

consider the issue ourselves notwithstanding the parties' agreement. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Still, because the sole participant in this case to even suggest that the VJRA precludes review of Veterans's constitutional challenge to the mental health care delays is our dissenting colleague, we discuss the issue only briefly.

Section 511(a) provides,

> The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. . . . [T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.[25]

The "question of law" presented here is whether the VA's lack of procedural safeguards to ensure that veterans timely obtain the mental health care to which they are entitled – such as an appeals process to challenge appointment scheduling – violates the Due Process Clause by providing insufficient process. It is debatable whether that question of law is one that is *necessary* to a decision by the Secretary" affecting veterans' benefits, like the question of what evidence is

---

[25] Section 511(b) provides for four exceptions, none applicable here: (1) the review of VA rules and regulations under § 502, (2) suits in district court concerning claims related to federally provided insurance, (3) suits under specific provisions relating to housing and small business loans, and (4) review by the Board of Veterans' Appeals and the Veterans Court.

55

required to make out a benefits claim for service-connected PTSD. *See, e.g.*, Stressor Determinations for Posttraumatic Stress Disorder, 75 Fed. Reg. 39,843, 39,843 (July 13, 2010); *see* 38 C.F.R. § 3.304(f)(3) (2010). We need not resolve the issue of necessity, however, because the Secretary has not actually issued a "decision" answering this constitutional question at all. The VA may assume and even argue that its system for providing mental health care services is constitutionally sound, but it has not issued a "*decision*" on the question that is "final and conclusive and" unreviewable, the way it might issue, for example, a "rating decision" concerning a particular veteran's degree of disability for purposes of calculating compensatory benefits. *See* 38 U.S.C. § 1156(b)(1)(B).

The dissent argues that "there is simply no way to adjudicate the due process claim without 'determining first' whether the VA's administrative staff 'acted properly in handling' veterans' requests for appointments," which "will depend on the facts of each veteran's case" – which we may not review. Dissenting op. at 15 (quoting *Price v. United States*, 228 F.3d 420, 422 (D.C. Cir. 2000) (per curiam) and citing *Thomas v. Principi*, 394 F.3d 970, 974 (D.C. Cir. 2005)) (internal alterations omitted)). But of course there is: Veterans challenge the lack of adequate *procedural safeguards* to ensure that veterans receive timely care. To make out that claim they must simply demonstrate "the *risk* of an erroneous

56

deprivation" of care "through the procedures [currently] used, and the probable value, if any, of additional of substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1975) (emphasis added). Veterans need not, and do not, seek to relitigate in federal court whether VA staff actually "*acted* properly in handling" individual veterans' requests for appointments, dissenting op. at 14, 15; no individual veteran is before us seeking to challenge the timing of an individual appointment that *he* just received. Rather, Veterans point to the past as evidence of the "*risk* of an erroneous deprivation" their members now face.

Put differently, this is not a tort suit brought by an individual veteran, as in the two cases cited by the dissent, where "underlying the claim is an allegation that the VA *unjustifiably denied him* a veterans' benefit." *Thomas*, 394 F.3d at 974 (emphasis added). The relevant "decision[s]" as to "question[s] of law and fact" in those cases were "decision[s]" about individual benefit determinations, which were insulated from review as soon as the Secretary had made those "decision[s]." Instead, this is a suit for an injunction to require that "additional or substitute procedural safeguards" be provided *in the future*, if the cost to the government of such safeguards is justified by the reduction in risk they would produce. *Mathews*, 424 U.S. at 335. The relevant "decision" here as to a "question of law" is whether the existing safeguards are constitutionally sufficient; the Secretary has not

57

rendered a "decision" on that question, so the triggering condition for § 511's preclusive effect does not now exist – assuming the Secretary's answer to a "question of law" such as this could ever fit within the meaning of "decision," which is most unlikely. *See infra*, at 79–80. The VA is not mistaken in understanding that the nature of Veterans's suit falls outside the reach of § 511(a).

**2**

We turn, then, to the merits of Veterans's due process claim. The record before us shows that some veterans with severe depression or PTSD are forced to wait over eight weeks for mental health referrals. During that period, some of those veterans take their own lives. The district court found that there are about 18 suicides per day among veterans, including four to five suicides per day among veterans enrolled to receive VA health care.[26] In 2008, one VHA physician identified "about 1,000 suicide attempts per month" among the veterans seen in VHA facilities.[27] The precise constitutional question with which we are presented

---

[26] The VA's statistics do not differentiate between veterans who are simply enrolled with the VA, veterans who are receiving other types of (non-mental health related) medical treatment, veterans who are on waiting lists for mental health treatment, and veterans currently receiving mental health care.

[27] This figure comes from an email written by the Deputy Chief of Patient Care Services for VA's Office of Mental Health on February 13, 2008. The email read as follows:

(continued...)

58

is whether the VA's delays in the provision of care amount to a deprivation of "property" without due process, a violation of the Fifth Amendment.

**a**

First we must find that Veterans allege a deprivation of life, liberty, or property. As we discuss above, 38 U.S.C. § 1710 creates an entitlement to health

---

[27](...continued)
Shh!
Our suicide prevention coordinators are identifying about 1000 suicide attempts per month among the veterans we see in our medical facilities. Is this something we should (carefully) address ourselves in some sort of release before someone stumbles on it?

That email was obtained by Veterans during discovery in this litigation, and first made public as a result. This message and others like it generated significant media attention. *See, e.g.*, Armen Keteyian, *VA Hid Suicide Risk, Internal E-Mails Show*, CBS News (Apr. 21, 2008), *available at* http://www.cbsnews.com/stories/2008/04/21/cbsnews_investigates/main4032921.s html. That attention, in turn, prompted a congressional investigation. *See The Truth About Veterans' Suicides*, Hearing Before the H.R. Comm. on Veterans Affairs, 110th Cong., 2d Sess. (May 6, 2008).

The dissent gets political reality exactly backwards when it asserts that "Congress already exercises vigorous oversight of the VA through its ability to hold hearings on the agency's operations," and that "[b]ecause Congress is already actively involved in the agency's affairs, programmatic improvements should be made in the offices of the VA or the halls of Congress, not through litigation." Dissenting op. at 34 (internal quotation marks and brackets omitted). To the contrary, this case demonstrates the crucial role for litigation initiated by injured parties in forcing the government to respond. Had the resulting oversight then yielded actual solutions, this case might have become moot. It is only because the government continued to fail to correct the VA's problems that we are compelled to address the constitutional questions presented here.

59

care for eligible veterans. The VA does not dispute that this entitlement creates a property interest protected by the Due Process Clause. Indeed, it is well-established that "the interest of an individual" in receipt of government benefits or services to which he is entitled "is a statutorily created 'property' interest protected by the Fifth Amendment." *Mathews*, 424 U.S. at 332.

**b**

Second, we must determine whether Veterans's members have been deprived of their property interest. In cases involving the termination of government benefits, the "deprivation" is clear. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 257 (1970). Similarly, we have long held that the outright denial of benefits to which an individual is entitled constitutes deprivation of a recognized property interest. *See, e.g.*, *Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588 n.7 (9th Cir. 1992) (denial of application for veterans' benefits implicates due process); *Griffeth v. Detrich*, 603 F.2d 118, 120-21 (9th Cir. 1979). Veterans's claim differs somewhat. They argue not that their members' requests for care have been decided by the VA and finally rejected, but instead that the delay in the provision of care sought "is tantamount to a denial of care," particularly for veterans who are suicidal. We agree.

In a related context, the Supreme Court has recognized that "the possible length of wrongful deprivation of . . . benefits is an important factor in assessing the impact of official action on . . . private interests." *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975). Thus in *Fusari*, the Court found that excessive delay in the adjudication of claims for unemployment benefits, during which time benefits were withheld, could yield a deprivation in its own right regardless of whether benefits were ultimately restored. And in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Court reasoned that "[a]t some point, a delay in [a] post-termination hearing would become a constitutional violation," though that point had not been reached in that case. *Id.* at 547; *see also Barry v. Barchi*, 443 U.S. 55, 66 (1979) ("[I]t was necessary that Barchi be assured a prompt post-suspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute as applied in this case was deficient in this respect, Barchi's suspension was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment."). Indeed, "at some point delay must ripen into deprivation, because otherwise a suit alleging deprivation would forever be premature." *Schroeder v. City of Chicago*, 927 F.2d 957, 960 (7th Cir. 1991) (Posner, J.).

We understand these cases to support the commonsense proposition that an unreasonable delay in the delivery of an entitlement can amount to a deprivation of that entitlement.[28]  Veterans who are deprived of timely mental health care are denied the opportunity to rehabilitate in a more timely manner and to avoid sinking deeper into depression and disability.  And, of course, for those veterans whose illness causes them to take their own lives in the interim, the deprivation is final.

## c

Finally, we must decide whether the process designed to protect veterans against the deprivation of their property interest is sufficient, or whether additional process is due.  We apply the traditional balancing test *Mathews v. Eldridge* in the context of veterans' entitlements.  *See, e.g.*, *National Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588 (9th Cir. 2002).[29]  The *Mathews* Court explained

---

[28] Whether that deprivation is actually *unconstitutional*, because inflicted without due process, is a distinct question to which we turn next.

[29] Contrary to the dissent's suggestion, *Walters v. National Association of Radiation Survivors*, 473 U.S. 305 (1985), did not create a new, special "high hurdle" for all due process challenges involving veterans.  *See* Dissenting op. at 24, 32–33.  *Walters* applied the *Mathews* formulation and determined that, *in light of* the government's strong, centuries-old interest in maintaining a veterans' claims system that is "as informal and nonadversarial as possible," "[i]t would take an extraordinarily strong showing of probability of error under the present system – and the probability that the presence of attorneys would sharply diminish that possibility – to warrant a holding that the fee limitation denies claimants due process of law."  *Id.* at 323, 326.

(continued...)

that "procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Fifth . . . Amendment, " *Mathews*, 424 U.S. at 332. According to *Mathews*, the "identification of the specific dictates of due process" with regard to a deprivation of a protected interest "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

---

[29](...continued)

Moreover, *Walters* was clear that government's interest in an "informal and nonadversarial" system, as defined by that case, was limited to "the system for administering benefits" within the VA. *Id.* at 321. The dissent cannot be serious when it suggests that the government has an interest in an "informal and nonadversarial" resolution to the years of federal-court litigation in *this* case. Dissenting op. at 1–2, 24. Although our decision today is the product of adversarial litigation and results in an injunction being entered against the VA, it does nothing to compromise the "informal and nonadversarial" procedures *within* the VA during the initial adjudication of claims for veterans benefits. Indeed, in part IV of this opinion we reaffirm *Walters*'s holding that the limitation on payments to attorneys during regional-level agency adjudications does not violate due process.

**(1)** The district court correctly concluded that, with respect to the first *Mathews* factor, "the private interest of veterans in receiving health care is high." Proper care can alleviate the severe toll that PTSD takes on veterans and their families, and it reduces the incidence of suicide. The district court erred, however, in its conclusion that the risk of erroneous deprivation was low, and in its determination that Veterans had failed to prove a systemic denial or unreasonable delay in mental health care provision that would create a high risk of erroneous deprivation. It similarly erred in its conclusion that the third *Mathews* factor weighs against imposing additional procedural safeguards, based upon its erroneous assumption that such safeguards would impose undue administrative burdens on the VA. We examine each of the latter two factors in turn.

**(2)** In weighing the second *Mathews* factor, the district court substantially underestimated the risk of erroneous deprivation faced by veterans with serious mental illnesses and disorders. Veterans did not prove conclusively at trial that veterans seeking mental health care face a *high* risk of detrimental delays in the provision of care, but the district court's factual findings support the conclusion that there is a *significant* risk that delays in treatment will harm veterans. *Mathews* requires us to balance that risk of erroneous deprivation against the "probable value, if any, of additional . . . procedural safeguards." *Mathews*, 424 U.S. at 335.

64

In the area of scheduling veterans for mental health care appointments, the marginal value of "additional" procedural safeguards is extraordinarily high, because at present *no* procedure is in place to ensure that mental health appointments are provided soon enough to be effective.

Although a "clinical" decision made by a mental health care professional – such as a nurse, doctor, or psychologist – to place a veteran on a waiting list for care may be appealed, a veteran has no opportunity at all to appeal a receptionist or call center's "administrative" decision that he must wait to receive mental health care.[30] In the district court, Dr. Murawsky, the chief medical officer of one of the VA's 21 national regions, was asked what would happen "if the veteran is told that 'You get an appointment in 60 days,' and the veteran wants an earlier appointment." He responded that the VA's "policy *doesn't cover appointment time*." (Emphasis added.) Indeed, veterans whose delayed care stems from administrative decisions have no right to speak with a supervising administrator about their need for more immediate care, nor to insist that they be evaluated by a medical professional, nor to secure any other review that would lessen the likelihood that diagnosis and treatment are delayed too long for their cases.

---

[30] Veterans do not challenge the clinical appeals process, described *supra* at 17–18, here, and so we do not address its adequacy.

65

Only if a scheduling decision were made by a medical professional – for example if a "nurse or physician sa[id] 'You're medically stable . . . – an appointment in six weeks is appropriate'" – would a veteran have any opportunity to request a review, through the clinical appeals process. Of course, at that point the veteran would at least have been *evaluated* by a medical professional – something that a veteran calling by phone or speaking to a receptionist would *not* automatically get, unless he walked into a VA emergency room or clinic and actually "expressed suicidal intentions." Like most medical patients, veterans are generally scheduled first by administrative staff, and then seen second by medical personnel (at their scheduled appointments) – not the other way around, as the dissent suggests.

There is, quite simply, no process for review of a scheduler's assignment of a mental health care appointment weeks in the future. The district court's suggestion that the clinical appeals process offers a sufficient procedural safeguard for all veterans on VHA waiting lists, including those placed on such lists by administrators, is clearly contrary to the record. So too does the dissent improperly confuse the distinction between clinical delays, for which some process is provided, and administrative ones, for which there is none.[31]

_____

[31] We have not "misunderst[ood] [the] evidence" of the existing procedural
(continued...)

The record before us is replete with examples of deleterious delay in the VHA's provision of mental health care, and shows that many veterans throughout the country have no means available to appeal the delays to which they are subjected. The record contains one story, for example, of a veteran who committed suicide after calling the VA to report his suicidal thoughts but was told he would be over 25 places down on a waiting list for treatment. In another case, a former U.S. Marine who was at the Pentagon on September 11, 2001, and later served in Iraq, reported a delay of almost eight weeks before the VA would see him after "telling the VA repeatedly that I was suicidal" and having already been diagnosed with PTSD. All told, over 84,000 veterans are on waiting lists for mental health care. The district court made no finding as to the number of veterans who were placed on waiting lists by administrators, as opposed to clinicians. Veterans argue that vast numbers of veterans are denied access to mental health care by administrators, and the VA offers no evidence to rebut this claim. What is clear is that veterans have no recourse when they are told that they cannot be scheduled sooner for a mental health appointment.

---

[31](...continued)
safeguards, as the dissent suggests, dissenting op. at 25; we have simply avoided the error made by the district court and the dissent of improperly confusing the distinction between clinical delays and administrative ones and conflating the issues unique to each. *See* Dissenting op. at 25–30.

This absence of procedural safeguards is particularly alarming in view of the apparent ineffectiveness in the scheduling system. In July 2005, an "Audit of the Veterans Health Administration's Outpatient Scheduling Procedures" conducted by the VA's Office of Inspector General found that the "VHA did not follow established procedures when scheduling medical appointments for veterans seeking outpatient care," including mental health care. Two years later, a follow-up audit revealed that five of the eight recommendations for improvement made in 2005 had not been implemented. Specifically, the 2007 report found: 72 percent of patient appointments had "unexplained" delays between dates care was requested by veterans and their clinicians and the dates appointments were scheduled; schedulers were not adequately trained, particularly on scheduling consult appointments with specialists; and that pressure to reduce the length of patient waiting lists had caused schedulers to avoid placing patients on lists for appointments at all.

Similarly, a 2005 U.S. Government Accountability Office report on VA services for PTSD found that the VA had not developed referral mechanisms to provide PTSD services when those services were not available at community-based clinics, and challenged the "VA's capacity to identify and treat veterans returning from military combat who may be at risk for developing PTSD, while maintaining

68

PTSD services for veterans currently receiving them." And the district court found that, while the Feeley Memorandum states that veterans who present to a Medical Center or Community Based Outreach Center for the first time with mental health issues should be evaluated within 24 hours, the VA lacks any method to ensure compliance with this 24-hour evaluation policy and does not know whether the policy has been implemented.

This is therefore not a case in which existing procedures are sufficient, such that additional process is unlikely to produce significant marginal reductions in the risk of erroneous deprivation. *See, e.g.*, *Mathews*, 424 U.S. at 343-46. Instead, the underlying scheduling system is flawed, and there is no procedure whatsoever for veterans to challenge their delays. Consequently, *any* additional procedure would produce a meaningful improvement in ensuring that veterans are not left to wait too long to get the care they need.

**(3)** The district court's weighing of the third *Mathews* factor was similarly erroneous. It concluded that "additional safeguards" in the VHA's system for treating veterans with mental health issues would impose unwarranted "burdens on the VA." The district court did not make any specific factual findings based on the record in the case before us as to the nature and extent of additional administrative burdens that would be imposed upon the VA, if additional procedural safeguards

69

were introduced to facilitate veterans' ability to secure their entitlement to mental health care in a timely and effective manner. Instead, it appears to have based this conclusion solely on a quotation plucked from a Supreme Court case regarding the government's "'genuine interest in allocating priority to the diagnosis and treatment of patients . . . rather than to time-consuming procedural minuets.'" (Quoting *Parham v. J.R.*, 442 U.S. 584, 605 (1979)). The VA now cites this same language.

Cases are not quotations, however, to be relied upon like entries in *Bartlett's* purely for their convenient turns of phrase.[32] Rather, cases are clusters of facts and applications of legal principles to those facts that must be read in whole. *Parham*, which examined the due process rights of minors committed to state psychiatric facilities by their parents, emphasized Georgia's "significant interest in not imposing unnecessary procedural obstacles that may discourage the mentally ill or their families from seeking needed psychiatric assistance." 442 U.S. at 605. That is, the Court was concerned that additional procedure would *create* delay, which would harm the state's interest in making hassle-free treatment available to families that need it. Indeed, the unabridged sentence from *Parham* is: "The State

---

[32] *See* BARTLETT'S FAMILIAR QUOTATIONS: A COLLECTION OF PASSAGES, PHRASES, AND PROVERBS TRACED TO THEIR SOURCES IN ANCIENT AND MODERN LITERATURE (17th ed. 2002).

also has a genuine interest in allocating priority to the diagnosis and treatment of patients *as soon as they are admitted to a hospital* rather than to time-consuming procedural minuets *before the admission*." *Id.* (emphasis added). Here, the government is not prioritizing the diagnosis and treatment of patients over unnecessary delay. To the contrary, it is embracing delay over effective treatment.

If there is any justification for the VA's interest in maintaining the status quo, it has not told us, and we cannot imagine one. Cost – often claimed by the government as an interest in less robust process – does not seem to be at issue here. The VA does not mention expense, and as the district court found, "the VHA's Chief Financial Officer testified that the VHA is not currently facing a budget crisis and has adequate money to 'meet the mission requirements.'" Moreover, the VA has hired more than 3,800 new mental health staff over the past few years, and 500-600 positions still remain unfilled. In fact, the only governmental interest we can conceive of is the same as Veterans's: expediting the provision of mental health care to save the lives of men and women who have fought for our country. As the government represented at oral argument, "The VA is firmly committed to ensuring that our nation's veterans receive top-quality health care." Oral Arg. Audio at 25:12.

*   *   *

We have determined that veterans have a towering interest in avoiding delays in their mental health care, the risk of erroneous deprivation is high given the absence of review procedures, the value of additional procedural safeguards would be great, and the government's interest does not weigh against additional protections. The current delays therefore constitute a deprivation of Veterans's mental health care without due process, in violation of the Fifth Amendment.

We reverse the district court's judgment to the contrary, and remand for further proceedings. On remand, the district court shall conduct hearings in order to determine what additional procedures or other actions would remedy the existing due process violations in three core areas. The district court shall consider what procedural protections are necessary to ensure that:

(1) individuals placed on VHA waiting lists for mental health care have the opportunity to appeal the decision in a timely manner and to explain their need for earlier treatment to a qualified individual;

(2) individuals determined to be in need of mental health care receive that treatment in a timely manner; and

(3) individuals with urgent mental health problems, particularly those at imminent risk of suicide, receive immediate mental health care.

72

Although, as we have noted earlier, the district court may not order the VHA to implement the Mental Health Strategic Plan or institute the recommendations of the Feeley Memorandum, it may consider specific procedures or measures mentioned in both to aid in its determination as to what procedures are necessary. The district court's determination may also draw upon the findings of the 2007 VA Office of Inspector General Report, and other evidence already in the record or adduced at a hearing following remand; we recognize that circumstances may have evolved since the district court last took evidence three years ago.

We still remain hopeful that at least some of the problems in this case can be resolved by the parties working together. The district court should encourage them to meet and confer to propose a remedial plan that addresses the mental health care delivery problems described above, to be presented to the court for approval. It is within the discretion of the district court to consider obtaining the assistance of a Magistrate Judge or appointing a Special Master to aid the court in any way deemed necessary. In the end, the district court shall either approve a plan agreed upon by the parties or enter an appropriate order instructing the VHA to provide Veterans with the procedural safeguards to which they are entitled.

**III**

73

We next address Veterans's statutory and constitutional claims concerning the delays in the VBA's claims adjudication system, particularly in the claims appeals process.

On appeal, Veterans challenge the district court's denial of relief for these claims and contend that relief is warranted under both the APA and the Due Process Clause. Once again, we affirm the district court's denial of Veterans's statutory claim, but reverse the district court's ruling on their constitutional claim. We hold that Veterans's entitlement to service-connected death and disability compensation is a property interest protected by the Due Process Clause, and that the lack of adequate procedures to prevent undue delay in the provision of that property constitutes a deprivation that violates Veterans's constitutional rights.

## A.    APA Challenge to Delays in Compensation Claim Appeals

In considering Veterans's APA claim with respect to benefits adjudication, we are, once again, bound by the Supreme Court's instruction in *Norton* that: "General deficiencies in compliance, unlike the failure to issue a ruling . . . lack the specificity requisite for agency action." *Norton*, 542 U.S. at 66. Veterans's APA claim concerning timely and acceptable adjudication of veterans' service-connected death and disability claims cannot proceed because Veterans do not

74

assert that the VA "failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64.

The district court erred in stating: "It is uncontested the adjudication of benefits claims is a discrete agency action that the VA is required to take." That analysis failed to consider the cornerstone of Veterans's APA claim. Veterans are challenging pervasive deficiencies in the adjudication process that harm their members, not delays in discrete benefits adjudications that the VA is required to make. As discussed above, agency action to remedy widespread delays is not a discrete, "required" action under § 706(1). On this basis alone, Veterans are barred from seeking statutory relief that is dependent upon the VA's waiver of sovereign immunity under the APA. *See Norton*, 542 U.S. at 63-65. We therefore affirm the district court's dismissal of Veterans's APA claim, on the basis that it does not meet the APA requirement for reviewability.[33]

**B.  Due Process Clause Challenge to Delays in Compensation Claim Appeals**

**1**

---

[33] Because Veterans are barred from seeking statutory relief under the APA, we need not consider the VA's alternative arguments that 38 U.S.C. § 502 or § 511 also bar consideration of Veterans's statutory claims.

First we must consider whether we may hear Veterans's constitutional claim. The VA argues that we lack jurisdiction to do so, because the VJRA divests all federal courts but the Veterans Court and the United States Court of Appeals for the Federal Circuit of jurisdiction to review any question concerning veterans benefits. We reject that contention. In our view, the VJRA does not strip district courts of jurisdiction to hear constitutional challenges to the VA's system-wide conduct, divorced from challenges to individual benefits determinations.

The VA points to two sections of the VJRA, sections 502 and 511. Neither applies here.

**a. Section 502.** 38 U.S.C. § 502 states, "An action of the Secretary to which [5 U.S.C. §§ 552(a)(1), 553 (the APA provision concerning rulemaking)] refers is subject to judicial review. Such review . . . may be sought only in the United States Court of Appeals for the Federal Circuit." The district court determined that, given § 502's grant of exclusive jurisdiction to the Federal Circuit, "any challenge by [Veterans] to VA regulations is not reviewable in this Court." It found that provision relevant because, in its view, granting Veterans the relief they seek "would invariably implicate VA regulations." Consequently, it held that "any such challenge is reviewable only in the Federal Circuit" under § 502.

76

By its plain text, however, § 502 concerns only "judicial review" of "action[s] of the Secretary" as defined by the APA. We are thus presented with *Norton*'s complement: for the same reason that the delays Veterans challenge are not "action[s] of the Secretary" that are reviewable under the APA, *see supra* at 49–54, they are not actions that may be challenged in the Federal Circuit only. Section 502 is clear in its purpose of directing APA-based challenges to the VA's rules and regulations to a single federal court, in derogation of the APA's general grant of judicial review in all courts. So we cannot read its jurisdiction-stripping provision any more broadly than the narrow class of actions that may actually be challenged under the APA after *Norton*.

In addition to § 502's plain text, our precedent dictates this result. In *Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005), we held that § 502 bars review outside the Federal Circuit of "*direct* challenges to VA rules and regulations" only. *Id.* at 821 (emphasis added). And in *Nehmer v. Department of Veterans Affairs*, 494 F.3d 846 (9th Cir. 2007), we determined that § 502 concerns only suits that "*directly* challenge either the merits of the VA's regulation or the VA's rulemaking authority." *Id.* at 857–858 (emphasis added). Veterans challenge neither, but only the VA's failure to discharge its duty to veterans in a

77

short enough time to avoid depriving them of their property interest without due process.

Finally, we find that the district court's concern that "an order expediting claims adjudications . . . would force the VA to alter or repeal some of [its] regulations," and thus would violate § 502, was entirely misplaced. As just explained, § 502 limits judicial review of discrete agency actions, not claims of the type asserted here. Veterans's only surviving claim with regard to benefits is a facial constitutional challenge to the VA's actual *conduct*, not its codified *rules*, so § 502 is not implicated at all. *See Nehmer*, 494 F.3d at 858–859 (where plaintiffs "challenge[d] the *actions* of the VA in failing to comply with the terms of" a court order, § 502 did not bar review "irrespective of the existence of the VA regulations" that were adopted in response to the order, because the claim was not a "facial challenge to VA regulations"). While the VA may *choose* to modify its regulations to comply with a remedial order, that future remedy would not convert Veterans's suit into an action for judicial review of an agency action subject to § 502. Thus, § 502 does not affect our ability to review Veterans's constitutional claims.

**b. Section 511.** The district court understood § 511 to preclude "review of individual benefits decisions," but not "facial constitutional challenges to the VA

78

benefits system." Nonetheless, the court determined that § 511 barred review, because "the determination of whether the delay is unreasonable may depend on the facts of each particular claim," which individually may not be reviewed in district court.

Section 511 blocks review of "decision[s] of the Secretary" as to any "questions of law and fact *necessary to a decision* by the Secretary *under a law that affects the provision of benefits*." 38 U.S.C. § 511(a) (emphasis added). Under the statute's plain text, there are three problems with the district court's analysis.

First, the conduct Veterans challenge is not a "decision" within the meaning of § 511. While the term "decision" is not expressly defined in the statute, we understand it in the context of the statute to mean individual benefits adjudications – the type of individualized decisions Congress sought to keep out of the district courts. *See* H.R. Rep. No. 100-963, 1988 U.S.C.C.A.N. 5782, 5803–5804. Section 1156, for example, discusses "ratings decision[s]" by the Secretary that determine the degree of disability of a temporarily disabled veteran. 38 U.S.C. § 1156(b)(1)(B). Section 3107 concerns vocational rehabilitation benefits for veterans, and provides that "[t]he Secretary shall review [a veteran's] statement [of disagreement with his rehabilitation plan] and render a decision on such

79

review . . . ." 38 U.S.C. § 3107(c)(3). Later sections that refer to § 511 shed further light on the meaning of "decisions" as "individual determinations." Section 5104, for example, is titled "Decisions and notices of decisions," and explains that the Secretary must give a claimant notice "of *a decision* by the Secretary *under § 511* of this title affecting the provision of benefits to *a claimant*." 38 U.S.C. § 5104(a) (emphasis added). And § 7104, which outlines the jurisdiction of the Board of Veterans' Appeals, provides, "All questions in a matter which under section 511(a) of this title is subject to decision by the Secretary shall be subject to one review on appeal to the Secretary. Final decisions on such appeals shall be made by the Board [of Veterans' Appeals]." 38 U.S.C. § 7104. Veterans do not challenge a "decision by the Secretary" here. Instead, they challenge systemic delays in the benefits adjudication process that deprive them of the aid to which they are entitled.

Second, even if the term "decision" did apply, § 511 precludes judicial review only of "decision[s]" actually made by the Secretary. As with Veterans's constitutional challenge to the delays in the delivery of mental health care, whatever "questions of law" the challenge may require us to answer are not questions the VA has already answered. Nor has the VA made a final decision in Veterans's members' appeals; that their appeals languish *un*decided is the very

basis for their claim.[34]  We thus agree with the Federal Circuit's interpretation of this provision: "Section 511(a) does not apply to every challenge to an action by the VA.  As we have held, it only applies where there has been a 'decision by the Secretary.'  In the context of the history of this provision, the statute plainly contemplates a formal 'decision' by the Secretary or his delegate." *Bates v. Nicholson*, 398 F.3d 1355, 1365 (Fed. Cir. 2005) (citation omitted).  Veterans do not challenge the VA's initial ratings decision in their members' cases here, just the VA's systematic failure to timely render decisions on appeal.

Finally, unlike § 502, § 511 does not grant *exclusive* jurisdiction to any agency or court over a class of legal claims, except challenges to "decision[s]" within the meaning of § 511 that have actually been made by the Secretary.  Nothing in § 511 prevents claims that could be (but have not yet been) adjudicated by the Secretary, and then reviewed by the Court of Veterans Claims and the Federal Circuit, from being raised in another court of competent jurisdiction instead.  Our view in this regard accords with that of the D.C. Circuit:

> Section 511(a) does not give the VA *exclusive* jurisdiction to construe laws affecting the provision of veterans benefits or to consider all issues that might somehow touch upon whether someone receives

---

[34] The VA's argument (Gov't Br. 41 n.10) that "there is no question that the VA is actually deciding benefits claims" is thus misplaced; § 511 is concerned only with extant, not potential, decisions.

81

veterans benefits.  Rather, it simply gives the VA authority to *consider* such questions when making a decision about benefits, and . . . prevents district courts from "review[ing]" the Secretary's decision *once made*.

*Broudy v. Mather*, 460 F.3d 106, 112 (D.C. Cir. 2006) (emphasis added).  Thus in

*Broudy*, the plaintiffs' claim that VA officials had obstructed their access to

benefits proceedings by withholding or covering up relevant information was not

barred by § 511 because "the Secretary ha[d] never decided th[o]se questions."  *Id.*

at 114.

The Federal Circuit agrees as well. In *Hanlin v. United States*, 214 F.3d

1319 (Fed. Cir. 2000), that court explained:

We do not read [§ 511] to require the Secretary, and only the Secretary, to make all decisions related to laws affecting the provision of benefits.  Rather, once the Secretary has been asked to make a decision in a particular case (e.g., through the filing of a claim with the VA), 38 U.S.C. § 511(a) imposes a duty on the Secretary to decide all questions of fact and law necessary to a decision in that case."

*Id.* at 1321.  Consequently, the plaintiff in that case, an attorney for a veteran to

whom the VA was supposed to send a portion of his client's benefit award as a fee,

was permitted to sue the VA in the Court of Federal Claims, notwithstanding the

fact that his "claim arises under [the attorney's fees provision of title 38], which is

'a law that affects the provision of benefits' within the meaning of" § 511. *Id.* at

1321.

82

We recognize, however, that the Sixth Circuit has construed § 511 more broadly than have the D.C. Circuit and Federal Circuit. In *Beamon v. Brown*, 125 F.3d 965 (6th Cir. 1997), the court considered a putative class action brought by veterans to challenge delays in the processing of veterans' benefits. The court found these claims barred by § 511, reasoning:

> Such a challenge raises questions of law and fact regarding the appropriate methods for the adjudication of veterans' claims for benefits. Determining the proper procedures for claim adjudication is a necessary precursor to deciding veterans benefits claims. Under § 511(a), the VA Secretary shall decide this type of question.

*Id.* at 970. We fail to understand how the Sixth Circuit squared its reasoning with the plain text of the statute, which makes no mention of "precursors" or "procedures," but only decisions. Its conclusion is all the more odd in light of § 511(b), which excepts from § 511(a) challenges to the VA's rules and regulations. Even if the term "decision" did encompass the Secretary's "[d]etermin[ation] [of] the proper procedures for claim adjudication," that determination would typically be made by rule and thus exempt from § 511(a)'s bar to review.

Not only do we find more persuasive the positions of the D.C. Circuit and Federal Circuits, but we would be prohibited from adopting the Sixth Circuit's view even if we were inclined to do so because of the particular nature of this case.

83

The Sixth Circuit relied heavily in its analysis on the availability to the plaintiffs of an alternate forum for their constitutional claims in the Veterans Court. *Beamon*, 125 F.3d at 971–974. But, as the district court recognized, the Veterans Court would lack jurisdiction over the type of claims raised by the plaintiffs here, even if they were raised by Veterans' members individually. The Veterans Court has acknowledged that "[n]owhere has Congress given this Court either the authority or the responsibility to supervise or oversee the *ongoing adjudication process* which results in a BVA decision." *Clearly v. Brown*, 8 Vet. App. 305, 308 (1995) (emphasis added); *see also Dacoran v. Brown*, 4 Vet. App. 115 (1993) (noting that constitutional challenges could be "presented to this Court only in the context of a proper and timely appeal taken from such decision *made* by the VA Secretary through the BVA") (emphasis added).

Moreover, *organizations* such as Veterans could not present claims to the Veterans Court, whose jurisdiction is limited to appeals from the BVA. If we were to adopt the Sixth Circuit's broad reading of § 511, then the plaintiff organizations would be deprived of any forum in which to raise their claims.[35] As the *Beamon*

---

[35] The plaintiff organizations are, of course, separate entities from their members. We fail to understand how the dissent can suggest that these independent corporate persons litigating in their own names, although borrowing their members' standing, are no different from a group of individual veterans

(continued...)

court itself noted, the possibility of interpreting the predecessor to § 511 "as a complete bar to the judicial review of all challenges to such decisions" has led the Supreme Court to decide that the provision did not preclude district courts from hearing *constitutional* challenges relating to veterans benefits, for fear "of the constitutional danger of precluding judicial review of constitutional claims." *Id.* at

---

[35](...continued)
litigating as a plaintiff class. *See* Dissenting op. at 12–13. Indeed, the Supreme Court years ago rejected the argument that "[b]oth associational standing and [class actions] are 'designed to serve precisely the same purpose.'" *United Auto. Workers v. Brock*, 477 U.S. 274, 288 (1986). The Court explained,

> While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack. These resources can assist both courts and plaintiffs. As one court observed of an association's role in pending litigation: "[T]he interest and expertise of this plaintiff, when exerted on behalf of its directly affected members, assure 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.' "

*Id.* at 289 (first internal quotation marks and citations omitted). That is, an organization is much more than a mere "tool, like class actions, for vindicating individual members' interests." Dissenting op. at 13.

971–972 (citing *Johnson v. Robison*, 415 U.S. 361 (1974)).  For that same reason, we could not construe § 511 so broadly here given the specific nature of this case.[36]

The purpose of the VJRA was to keep thousands of suits concerning individual benefits determinations from crowding the dockets of the federal courts, on top of the social security cases and immigration petitions for review that already keep them busy reviewing agency actions.  Although the VA and the dissent struggle mightily to ignore the nature of this suit, it is plain that a structural constitutional challenge is beyond the jurisdiction of the Veterans Court to hear

---

[36] A recent case before the D.C. Circuit considered a challenge similar to Veterans's claim here as to the benefits adjudication system.  *See Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654 (D.C. Cir. 2010).  That case was decided solely on standing grounds, as noted *supra* at 34 n.16.  *See Vietnam Veterans*, 559 F.3d at 661–662.  In the six pages of dicta that preceded that holding, however, the court discussed *Beamon* favorably before stating, "[o]ur discussion of this issue is tentative."  *Id.* at 659–661.  We give no weight to the tentative dictum of other courts.  In any event, *Vietnam Veterans* considered *Beamon* not for its holding as to § 511, but rather for its finding that the adequate alternative remedy in the Veterans Court barred review of the plaintiffs' APA-based challenge, because APA § 704 precludes review if an alternate remedy exists elsewhere.  *Id.* at 659 (citing *Beamon*, 125 F.3d at 967–970).  *Vietnam Veterans* went on to muse, "we think it virtually inevitable that it would be held that the [Veterans Court] has exclusive jurisdiction to hear due process claims" too, because those claims were "essentially identical" to the plaintiffs' "unreasonable delay claim" under the APA.  *Id.* at 660 & n.7.  We are aware of no principle that limitations on a statutory cause of action may be transferred wholesale to a constitutional claim simply because it arises from the same underlying events.

and, due in part to the Secretary's prolonged indecision on appeals, outside the preclusive sweep of § 511.

**2**

Turning, at last, to the merits of Veterans's constitutional claim, we hold that the district court rightly acknowledged that "many veterans have a protected property interest [under the Due Process Clause] as applicants for and recipients of SCDDC benefits." *Accord Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009) (holding that veterans' benefits are a protected property interest under the Fifth Amendment, because they are statutorily mandated and nondiscretionary in nature).

Confronted with the stark and sobering evidence of inexplicable delays in the benefits adjudication process, the district court stated that it could not conclude that the due process rights of veterans were violated by the absence of procedures designed to reduce delays in claim appeals, "in light of many of the factors creating these delays." To reach this conclusion, the district court relied primarily on the Seventh Circuit's decision in *Wright v. Califano*, 587 F.2d 345 (7th Cir. 1978), which found that 180-day delays in the adjudication of social security benefits did not constitute a due process violation under *Mathews v. Eldridge*, given the Social

Security Administration's "severe resource constraints." *Id.* at 354–356. The court found *Wright*'s "reasoning applicable to the present case."

In so ruling, however, the district court failed to properly analyze Veterans's due process claim by conducting a *Mathews* analysis of its own based on the facts of this case. "'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). *Wright* itself acknowledged that there could come a time "when due process is no longer due process because past due"; it just found that, on the facts of that case, that time had not yet been reached. *Wright*, 587 F.2d at 354. So we must undertake that analysis to see if process is "past due" here by "examin[ing] the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *FDIC v. Mallen*, 486 U.S. 230, 242 (1988).

First, we find that veterans' property interest in their service-connected death and disability compensation could not be more vital – many recipients of such

benefits are totally or primarily dependent upon that compensation for their financial support and the support of their families. A veteran receives no monies from the VA until his claim has been approved, which means that during the initial period of claim assessment and during the pendency of any appeal he and his family suffer tremendous privation. To pursue a claim to completion, for example, may take in excess of 4.4 years, even excluding "the time between an . . . initial decision [at the Regional Office level] and a veteran's NOD filing, which may be as long as one year"). During the pendency of such appeals, the record before us shows that many veterans perish, after living in want. The district court's memorandum of decision states, for example, that "[b]etween October 1, 2007, and March 31, 2008, alone, at least 1,467 veterans died during the pendency of their appeals," thus extinguishing their appeals. The private interest is thus strong – as is, indeed, the public interest, given the nature of the claimants.

Second, the VA attributes the delays in claims appeals, in part, to its placing a priority on adjudicating initial claims. We fail to understand, however, why prioritizing initial claim adjudications must come at the expense of timely appeals processing. Much of the delay appears to arise from gross inefficiency, not resource constraints. We are particularly doubtful, for example, that any government interest could justify the 573-day average delay for a Regional Officer

89

to certify an appeal to the BVA after receiving a veteran's form requesting an appeal – a step that we understand to be a ministerial task. We are as confounded as the Chairman of the BVA, who at trial "was unable to explain" the overall "lengthy delay in the resolution of appeals." If resource constraints are an issue, the VA has not asserted as much, and the record does not suggest that staffing or funding shortages are responsible for the delays in the adjudication process. To the contrary, the district court found that the VBA is rapidly increasing its staff.

Finally, we might find the VA's argument more compelling if it were not clear that prioritizing initial determinations over appeals has not worked, given the high reversal rate of those determinations. Only forty percent of initial decisions appealed are affirmed.[37] Between 19 and 44 percent of remands by the BVA, when appellate decisions are eventually reached, are "avoidable," meaning "an error

[37] *See also* Transcript of Oral Arg., *Astrue v. Ratliff*, No. 08-1322 (U.S. Feb. 22, 2010):
> [Assistant to the Solicitor General Anthony] YANG: [The reversal rate in the VA context is] in the order of either 50 or maybe slightly more than 50 percent. It might be 60. But the number is substantial that you get a reversal . . . .
> CHIEF JUSTICE ROBERTS: Well, that's really startling, isn't it? In litigating with veterans, the government more often than not takes a position that is substantially unjustified?
> MR. YANG: It is an unfortunate number, Your Honor. And it is – it's accurate.

[was] made by the R[egional] O[ffice] before it certifie[d] the appeal to the B[oard]." It is unlikely that initial adjudications can approach perfect accuracy even if priority is given to them. Under those circumstances, we do not find that the VA's interest outweighs veterans' in ensuring that those initial determinations that are incorrect get corrected quickly, even if the VA did actually have to make such a trade-off. Given that 60 percent of all appeals result in grants or remands, the risk of prolonged erroneous deprivation during these delays is high. We therefore find that the delays in the VA's claims appeals process amount to deprivation of property without due process.

We find support for our conclusion in the reasoning of other courts facing similar balancing determinations. Some courts, like the Seventh Circuit in *Wright*, have found no due process violation when faced with relatively short delays in the provision of benefits and substantial government interests. In *Barrett v. Roberts*, 551 F.2d 662 (5th Cir. 1977), for example, the Fifth Circuit found that 8- to 20-day delays in the receipt of a single month's welfare check did not deny due process, because those delays occurred during a semi-annual review for program eligibility, which was necessary to the government's interest in preventing undeserving recipients from claiming entitlements. In *Littlefield v. Heckler*, 824 F.2d 242 (3d Cir. 1987), the Third Circuit determined that a nine-month delay between the

91

issuance of an ALJ's "recommended decision" in a social security benefits case and a final decision by the Social Security Administration's Appeals Council was constitutional, given the volume of cases before the Appeals Council. *Id.* at 246–247. And the Second Circuit found that a 19-month delay in Medicare reimbursements of claims of under $500, caused by the government's requirement that claim disputes be heard by a private hearing officer prior to being adjudicated by an ALJ, was justified because (1) the private interest was low where the amount of benefits was small and not related to financial need, (2) the lack of information about the risk of erroneous deprivation during the delay, and (3) the government's substantial interest in resolving more claims through the informal procedure. *Isaacs v. Bowen*, 865 F.2d 468 (2d Cir. 1989).

By contrast, the Third Circuit determined that a three-year and nine-month delay in evaluating an application for a disabled child's annuity under the Railroad Retirement Act violated due process. *Kelly v. R.R. Retirement Bd.*, 625 F.2d 486 (3d Cir. 1980). The applicant sought disability benefits to sustain her while she fought severe depression. The court found it "wholly inexcusable" that "the administrative review process of a single disability application extended to nearly four years." *Id.* at 490. It reasoned, "Although there is no magic length of time after which due process requirements are violated, we are certain that three years,

nine months, is well past any reasonable time limit, when no valid reason for the delay is given." *Id.* The court rejected the Board's argument that the delay was necessary to gather evidence, because it found that no decision issued until more than one year after all evidence was gathered. Moreover, it found "the backlog of cases and limited resources of the Board" to be no excuse, because "[w]hatever its internal problems, the Board has the power to implement regulations that would accelerate the agency review process. Four years is totally out of phase with the requirements of fairness." *Id.* at 491.

And in *Kraebel v. New York City Department of Housing Preservation & Development*, 959 F.2d 395 (2d Cir. 1992), the Second Circuit found a likely due process violation when the city delayed granting property tax benefits to a landlord who was entitled to the tax benefits after rehabilitating her buildings as part of a city program. It took one and half years for the city to determine that the landlord was in fact entitled to the benefit. But, the court reasoned, "even before the state makes a definitive decision as to entitlement, the road to that determination must be paved by due process." *Id.* at 405. The court remanded for the district court to consider in the first instance whether the delay was justified, weighing the landlord's interest in prompt payment for her voluntary participation in a socially

beneficial program against the difficulty faced by the city in making eligibility determinations. *Id.* at 406.

We are confident that the present case fits comfortably within the latter category of cases rather than the former. This is not a case involving short but justified delays of critical benefits, *cf. Barrett*, moderate delays of important benefits caused by a system overload, *cf. Littlefield*, or long delays of minor benefits due to government interest in efficiency, *cf. Isaacs*. Instead, like *Kelly*, this case involves critical benefits to sustain those incapacitated by mental disability, delayed for an excessive period of time without satisfactory explanation.

Again, we remand to the district court with the instruction that it conduct evidentiary hearings in order to determine what procedures would remedy the existing due process violations in the VBA claims adjudication process. The hearings shall explore what procedural protections are most appropriate to permit the appeals of veterans to be expedited in the most efficient manner, with a particular emphasis on the procedural protections necessary for veterans suffering the most financial hardship during the adjudication of their claims. The district court may consider the need for setting maximum time periods for determinations at various stages of the claims adjudication process and/or the need for a procedure to expedite claims where emergency circumstances are shown to exist. As stated

94

above, the district court may seek the assistance of a Magistrate Judge or Special Master in creating and implementing a remedial plan, and the court should first encourage the parties to meet and confer to propose a remedial plan. In the end, the district court shall either approve an agreement reached by the parties or enter an appropriate order instructing the VBA to provide Veterans with the procedural safeguards to which they are entitled.

## IV

Veterans also assert that there is a lack of adequate procedures when veterans initially file their claims for service-connected death and disability benefits at their local VBA Regional Office ("RO").

Veterans file an initial claim for service-connected death and disability compensation with their RO. Veterans claim that the VA violates veterans' due process rights by failing to afford adequate procedural protections to veterans during the initial submission of their claims and the adjudication of those claims at the RO level, because there is no right to a pre-decisional hearing and discovery and veterans are prohibited from retaining paid counsel to assist them in the submission of their initial claim.[38] Veterans do not challenge the time period

---

[38] After the veteran files a Notice of Disagreement, thereby appealing from the RO level, the veteran is exempt from the prohibition on retaining paid counsel.

(continued...)

required for the initial adjudication of claims at the RO level, but rather they challenge solely the procedures in place (or lack thereof) to facilitate veterans' submission of their claims.  We affirm the district court on this claim because the non-adversarial procedures at the VA level are sufficient to satisfy the dictates of due process.

In reaching its conclusion that the RO level procedures do not violate veterans' due process rights, the district court conducted an analysis of the *Mathews* factors.  While the first factor weighs in favor of relief ("veterans and their families have a compelling interest in receiving disability benefits and . . . the consequences of erroneous deprivation can be devastating"), the district court concluded that the second and third factors do not support relief.  In concluding that the risk of erroneous deprivation at the RO level is relatively low, the district court noted that a small percentage of cases are affected, given the small percentage of RO determinations that are appealed.[39]  In addition, the district court noted that the third factor weighed against relief where the VA would face

---

[38](...continued)
38 U.S.C. § 3904(c)(1).

[39] We accord little weight to this fact as a measure of actual accuracy, in light of the uninviting appeals process.

96

"significant" fiscal and administrative burdens if required to implement Veterans's proposed additional procedural requirements at the RO level.

We note that the government also has an interest in maintaining the non-adversarial nature of RO level proceedings. With regard to the prohibition on retaining paid counsel, the Supreme Court has said:

> The Government interest, which has been articulated in congressional debates since the fee limitation was first enacted in 1862 during the Civil War, has been this: that the system for administering benefits should be managed in a sufficiently informal way that there should be no need for the employment of an attorney to obtain benefits to which a claimant was entitled, so that the claimant would receive the entirety of the award without having to divide it with a lawyer.

*Walters*, 473 U.S. at 322. The Court noted that allowing the payment of attorneys "would seriously frustrate the oft-repeated congressional purpose for enacting [the fee limitation]." *Id.* at 323. The *Walters* Court characterized the government's interest as warranting "great weight," and concluded that "[i]t would take an extraordinarily strong showing of probability of error under the present system – and the probability that the presence of attorneys would sharply diminish that possibility – to warrant a holding that the fee limitation denies claimants due process of law." *Id.* at 326. The plaintiffs in *Walters* failed to make this strong showing, and the court therefore held that there was no due process violation. *Id.* at 334. We are bound by that holding. If the Supreme Court's view of the benefits

97

and consequences of allowing veterans to have legal representation is to be changed or modified, it will have to be done by the Supreme Court itself, and not by a circuit court.

Although Veterans challenge a wider array of procedural restrictions than those at issue in *Walters*, the Supreme Court's analysis is directly applicable to the case before us. Underlying all the procedural restrictions cited by Veterans is what the Court has already held to be the government's interest in the creation and preservation of a non-adversarial system. Instead of allowing for paid attorneys to represent claimants and formal discovery, Congress imposed on the VA a duty to assist claimants in substantiating their claims for benefits. *See* 38 U.S.C. § 5103A. Veterans have failed to make a strong showing that the current system carries with it a high probability of error or that a more formal process would decrease the probability of error. Accordingly, we affirm the district court's ruling.

## V

Finally, Veterans contend that the district court erred in refusing to compel discovery of all suicide incident briefs and refusing to compel a response to an interrogatory seeking the average number of days PTSD claims take at the RO level.

98

We review for abuse of discretion the district court's discovery rulings and management of the trial. "[B]road discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (quoting *Goehring v. Brophy*, 94 F.3d 1294, 1305 (9th Cir. 1996)). To succeed on this challenge, Veterans must show "actual and substantial prejudice" resulted from the discovery rulings. *Hallett*, 296 F.3d at 751.

## A.    Suicide Incident Briefs

At a status conference, Veterans sought to compel discovery of suicide incident briefs – reports prepared by the VA following the suicide or attempted suicide of a veteran under VA care. The VA represented that there are 15,000 suicide incident briefs that would be subject to extensive redaction and argued that the redacted suicide incident briefs would be of little probative value. The district court asked Veterans what they would do with that information. Veterans responded: "I think it would potentially subject to analysis . . . to try to amalgamate the data across the system to show in practice how the procedures and policies that are in place with respect to mental health care, in fact, the small—." The district

99

court interjected "I don't think I have any authority to talk about their policies," and thereafter denied Veterans's motion to compel production.

Veterans claim that full discovery of all suicide incident briefs would have allowed them to establish links between the VA's failure to comply with its policies and procedures and veterans' suicides. Veterans, however, do not argue *how* they were prejudiced by the discovery ruling in the context of their specific APA and due process claims. There is no contention that the suicide incident briefs would have allowed Veterans to fulfill the APA's statutory requirements for judicial review set forth at 5 U.S.C. § 706(1) and delineated in *Norton*. It is possible that access to the suicide incident briefs might have provided Veterans with additional useful material in support of their due process claim concerning veterans' inability to appeal administrative scheduling decisions that delay necessary mental health care. However, such material is not necessary for Veterans to make out a valid claim – indeed, as we hold above, their eligibility for relief under *Mathews* has already been established by the district court's factual findings. In light of our holding reversing and remanding this case to the district court for the entry of an appropriate order remedying the due process violation that Veterans have suffered because of the VHA's delay in the provision of mental health care, we conclude that it is unnecessary to address this discovery issue.

**B. Average Time for Processing PTSD Claims at the RO Level**

Veterans also sought to compel a response to their interrogatory requesting the average amount of time it takes to process PTSD compensation claims at the Regional Office level. During the trial, Veterans raised the issue with the district court. The VA represented that Michael Walcoff, then Deputy Under Secretary for Benefits in the Department of Veterans Affairs,[40] would testify as to what data the VA has and why the VA cannot produce the data sought by Veterans. After Walcoff testified, Veterans filed a motion to compel by letter contending that "Walcoff's testimony, although consistent with the explanation provided by counsel for Defendants, does not support the 'not available' interrogatory answer provided by Defendants." The following day, April 29, 2008, the court denied Veterans's motion to compel.

Veterans contend that the district court abused its discretion in refusing to compel an answer to that interrogatory. We fail to see how this specific information would bolster Veterans's APA or due process claims. Veterans's statutory claims are foreclosed for the reasons we discuss above. Veterans's due process arguments concerning delays in claims adjudication focus on the time it takes to appeal benefits determinations. At the RO level, Veterans claim only that

---

[40] Walcoff was appointed Acting Under Secretary for Benefits in the Department of Veterans Affairs on Jan. 4, 2010.

101

the failure to provide more formal procedures for adjudicating benefits claims and the VA's use of a procedure to reduce benefits awards system violates due process. Veterans make no argument as to how further information on delays in processing PTSD claims at the RO level would support their due process claims regarding RO-level procedures. In the absence of any showing of how this additional information would have strengthened Veterans claims, we affirm the district court's ruling on this issue.

## CONCLUSION

The United States Constitution confers upon veterans and their surviving relatives a right to the effective provision of mental health care and to the just and timely adjudication of their claims for health care and service-connected death and disability benefits. Although the terms of the Administrative Procedure Act preclude Veterans from obtaining relief in our court for their statutory claims, their entitlements to the provision of health care and to veterans' benefits are property interests protected by the Due Process Clause of the Fifth Amendment. The deprivation of those property interests by delaying their provision, without justification and without any procedure to expedite, violates veterans' constitutional rights. Because neither Congress nor the Executive has corrected the

102

behavior that yields these constitutional violations, the courts must provide the plaintiffs with a remedy. We therefore remand this case to the district court with the instruction that, unless the parties resolve this dispute first, it enter an order consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

## COUNSEL

Gordon P. Erspamer (argued), Heather A. Moser, Ryan G. Hassanein, M. Natalie Naugle, and Stacey M. Sprenkel, Morrison & Foerster LLP, San Francisco, Cal.; and Sidney M. Wolinsky, Ronald Elsberry, Katrina Kasey Corbit, and Jennifer Bezoza, Disability Rights Advocates, Berkeley, Cal., for the plaintiffs-appelants.

Michael F. Hertz, Acting Assistant Attorney General; Joseph P. Russoniello, United States Attorney; and William Kanter and Charles W. Scarborough (argued), Appellate Staff, Civil Division, Department of Justice, for the defendants-appellees.

Veterans for Common Sense v. Shinseki, No. 08-16728

Chief Judge **KOZINSKI**, dissenting in large part:[*]

The majority hijacks the Department of Veterans Affairs's (VA's) mental health treatment and disability compensation programs and installs a district judge as reluctant commandant-in-chief. That judge must now decide "what procedural protections are necessary" to satisfy the majority's due process concerns, "enter an appropriate order instructing" the VA to change its procedures and then monitor the VA, perhaps indefinitely. Maj. op. at 72, 95. The majority tramples over the strict jurisdictional limits Congress has imposed on our ability to review the VA's decisions on veterans' benefits. See 38 U.S.C. §§ 502, 511. Not content to ignore Congress, the majority also brushes aside the Supreme Court's admonition that we must accommodate the strong government interest in making the VA's proceedings "as informal and nonadversarial as possible." Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 323–24 (1985). This is a recipe for endless rounds of litigation over the meaning of "necessary" and "appropriate," and the procedures the majority orders the district court to consider—imposing deadlines on the VA

---

[*] I join those portions of the opinion denying plaintiffs' Administrative Procedure Act claims, rejecting their challenge to the procedures for filing a claim at a Regional Office and affirming the district court's refusal to compel a response to one of their interrogatories. For the reasons articulated by the district court, I would affirm its refusal to compel production of all suicide incident briefs.

and requiring another layer of appeals—are the antithesis of an "informal and nonadversarial" system. Today's decision will undoubtedly distract the VA from its ultimate mission: taking care of veterans who risked their lives for our nation. Because I cannot join in today's Article III putsch, I dissent.

## I

Much as the VA's failure to meet the needs of veterans with PTSD might shock and outrage us, we may not step in and boss it around. Congress erected a big "keep out" sign for us in the Veterans' Judicial Review Act (VJRA), which provides that:

> The Secretary [of Veterans Affairs] shall decide <u>all questions of law and fact</u> necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans . . . . [T]he decision of the Secretary as to any such question shall be final and conclusive <u>and may not be reviewed by any other official or by any court</u> . . . .

38 U.S.C. § 511(a) (emphasis added). The VJRA precludes us from reviewing all decisions "by the Secretary or his delegate," <u>Bates</u> v. <u>Nicholson</u>, 398 F.3d 1355, 1365 (Fed. Cir. 2005), on "<u>all</u> questions of law and fact necessary to a decision" on veterans benefits, 38 U.S.C. § 511(a) (emphasis added). The statute also covers claims where review of such decisions is a "necessary predicate." <u>Price</u> v. <u>United States</u>, 228 F.3d 420, 422 (D.C. Cir. 2000) (per curiam). Thus, we lack jurisdiction

if adjudicating a claim "would require the district court to determine first whether the VA acted properly in handling [the veteran's] request." Id.; accord Thomas v. Principi, 394 F.3d 970, 974 (D.C. Cir. 2005); see also Broudy v. Mather, 460 F.3d 106, 115 (D.C. Cir. 2006).

The exclusive avenue for review of the VA's decisions is to file an appeal with the Board of Veterans' Appeals (BVA), a tribunal within the VA. 38 U.S.C. § 7104(a); see Price, 228 F.3d at 421 (VJRA "precludes judicial review in Article III courts of VA decisions affecting the provision of veterans' benefits"). From the BVA, a veteran may appeal to the Court of Appeals for Veterans Claims (Veterans Court), an independent Article I court, 38 U.S.C. § 7252(a), and then to the Federal Circuit, populated by Article III judges just like us, id. § 7292(c).

Applying the VJRA here should be short work. Plaintiffs claim that the VA's extensive delays in providing mental health care and disability compensation constitute a deprivation of statutory entitlements under the Fifth Amendment's Due Process Clause. See 38 U.S.C. § 1710(a)(1) (the VA must "furnish hospital care and medical services" that it "determines to be needed" to "any veteran for a service-connected disability"); id. § 1705(b)(1) (the VA must "ensure that the provision of care to [veterans] is timely and acceptable in quality"); id. § 1110 (veterans are entitled to compensation for "disability resulting from personal injury

suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty"). Mental health care and disability compensation are clearly "benefits." See 38 C.F.R. § 20.3(e) (defining "benefit" to include "any payment, service . . . or status, entitlement to which is determined under laws administered by the Department of Veterans Affairs pertaining to veterans"). Therefore, we lack jurisdiction to review the VA's decisions as to them. See Thomas, 394 F.3d at 975 (claims that VA "failed to render the appropriate medical care services" and denied "known needed and necessary medical care treatment" are "barred by section 511"); Vietnam Veterans of Am. v. Shinseki, 599 F.3d 654, 656 (D.C. Cir. 2010) (recognizing that decisions as to disability compensation fall under the VJRA); Littlejohn v. United States, 321 F.3d 915, 921 (9th Cir. 2003) (same). But we can't decide plaintiffs' due process claims without "determin[ing] first" whether the VA "acted properly in handing" requests for benefits; thus, we lack jurisdiction over these claims. See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; Broudy, 460 F.3d at 115. Because we lack jurisdiction, we must dismiss. Cf. Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514–15 (1868).

The majority appears to believe that Congress didn't mean what it said when it enacted the VJRA, and roves far and wide for reasons to circumvent its

limitations on our jurisdiction.  See maj. op. at 54–58, 76–87.  This is nothing less than a rebellion against Congress's consistent policy of limiting judicial review of the VA's affairs.  See H.R. Rep. No. 100-963, at 9 (1988) ("[O]ver the years, the Congress has declared its views that there should be no judicial remedy with respect to claims for veterans benefits, and this policy was honored for nearly 170 years." (emphasis added)).[1]  The majority eviscerates a statute Congress erected to beat back the last major judicial offensive against the VA.  See id. at 21–22; Beamon v. Brown, 125 F.3d 965, 971–72 (6th Cir. 1997) (discussing history of the VJRA).  As President Reagan might have said, "Here we go again."

---

[1] The majority believes that its interference is justified because "the stakes are so high for so many" and plaintiffs' claims involve "grave questions of life and death."  Maj. op. at 6 & n.3.  But Congress has enacted numerous restrictions on our power to review the VA's provision of benefits, none of which contain an exception for "grave questions of life and death."  See Act of Mar. 20, 1933, ch. 3, § 5, 48 Stat. 8, 9; Act of Oct. 17, 1940, ch. 893, § 11, 54 Stat. 1193, 1197; Act of Aug. 12, 1970, Pub. L. No. 91-376, § 8, 84 Stat. 787, 790; Veterans' Judicial Review Act, Pub. L. No. 100-687, § 101, 102 Stat. 4105, 4105–06 (1988) (VJRA); see also World War Veterans' Act, 1924, ch. 320, § 5, 43 Stat. 607, 608–09.  There's no doubt that Congress has the power to divest us of jurisdiction over such cases.  See Lockerty v. Phillips, 319 U.S. 182, 187 (1943).

In any event, Congress didn't foreclose judicial review.  Veterans can bring their claims to the Veterans Court and from there to the Federal Circuit, whose judges enjoy Article III independence.  The majority disparages our Federal Circuit colleagues by presuming that they are unable or unwilling to protect veterans' fundamental rights.

**A.** <u>Systemwide claims</u>: Plaintiffs claim that the VA's failure to (1) "timely provide medical care to PTSD recipients and claimants" and to (2) "timely resolve [service-connected disability] claims for PTSD" deprives "claimants of their property and liberty without . . . due process." Complaint ¶¶ 254(b), 260. Were an individual veteran to allege that the VA deprived him of these veterans' benefits, section 511 would preclude us from reviewing his case. <u>See</u> p.4 <u>supra</u>. Seeking to escape section 511's jurisdiction-stripping command, plaintiffs disavowed any intention of seeking relief for individual veterans:

> The facts herein pertaining to the [veterans and the organizational plaintiffs] are included for the specific purpose[] of . . . illustrating the Challenged VA Practices, and not for the purpose of obtaining review of decisions by the VA or CAVC. Nothing herein is intended or should be construed as an attempt to obtain review of <u>any decision</u> relating to benefits sought by <u>any veteran</u> . . . or to question the validity of <u>any benefits decisions</u> made by the Secretary of the VA.

Complaint ¶ 39 (emphasis added). Plaintiffs went out of their way to represent that "constitutional defects with the VA's systems, as set forth herein, are . . . divorced from the facts of any individual claim," <u>id.</u> ¶ 12, and that the "nature of the claims alleged herein and of the relief sought does not make the individual participation of

each injured member and/or constituent indispensable to proper resolution of the lawsuit," id. ¶ 38.[2]

Plaintiffs submitted evidence of <u>average</u> delays to the district court. Based on this evidence, the court found that 4.5 percent "of VA facilities . . . reported a wait time of 4–8 weeks" to see patients with "symptoms of moderate severity for depression" and 5.5 percent reported similar wait times for PTSD referrals. There were "approximately 84,450 veterans on VHA waiting lists for mental health services." The court also made findings as to the VA's average delay in processing a disability claim, concluding that it took "approximately 4.4 years . . . for a veteran to adjudicate a [disability compensation] claim all the way to a BVA decision."[3] The court didn't find that any individual veteran was actually denied or

---

[2] The majority thus misreads the complaint when it suggests that plaintiffs "complain of a variety of injuries actually being experienced or likely to be experienced in the near future by their members," who "would individually have standing." Maj. op. at 34 n.16.

[3] The court made the following findings (with emphasis added and acronyms spelled out): "On <u>average</u>, . . . it was taking 261 days for [a] Regional Office to mail [a] Statement of the Case to a veteran." It takes "573 days, on <u>average</u>, for [a] Regional Office to certify an appeal to the BVA." "On <u>average</u>, it takes the BVA 336 days to issue a decision . . . ." If a veteran requests a hearing, he "will have to wait, on <u>average</u>, 455 days." The majority cites these averages in its discussion. <u>See</u> maj. op. at 26.

likely to be denied his statutory entitlement to mental health care or disability compensation.

The majority concludes that "the conduct [plaintiffs] challenge is not a 'decision' within the meaning of § 511" because they don't "challenge the timing of an individual [benefit]," and instead "challenge systemic delays in the benefits adjudication process." Maj. op. at 57, 79–80. And it expressly relies on the average delays found by the district court: "All told, over 84,000 veterans are on waiting lists for mental health care." Id. at 67. "To pursue a claim to completion, for example, may take in excess of 4.4 years . . . . [during which] many veterans perish, after living in want. . . . We are particularly doubtful . . . that any government interest could justify the 573-day average delay for a Regional Office[] to certify an appeal to the BVA . . . ." Id. at 89–90 (emphasis added).

The majority purports to side with the D.C. Circuit in construing section 511 to permit plaintiffs' claims, id. at 83, but that court in fact heard a case where plaintiffs disavowed precisely the same individual claims and held that it lacked jurisdiction, see Vietnam Veterans of Am., 599 F.3d at 661–62. There, as here, plaintiffs "went out of their way to forswear any individual relief for the [veterans]." Id. at 662. Their complaint stated:

> To the extent any of the facts presented herein apply to individuals rather than to veterans as a whole, they are intended for illustrative purposes only. Nothing in this complaint is intended as, nor should it be construed as, an attempt to obtain review of an individual determination by the VA or its appellate system.

Id. at 657–58 (alteration and internal quotation marks omitted). Compare the quoted language from the two complaints: The only difference is that plaintiffs in our case have more explicitly disavowed individual relief. The D.C. Circuit plaintiffs also submitted affidavits alleging average delays in the VA's benefits appeals. Id. at 657; see id. at 662 ("[T]he asserted illegal action the VA has committed is described as the average length of time it takes at each stage of the claims process.").

The D.C. Circuit persuasively explained that plaintiffs' "rather apparent effort to avoid the preclusive bite" of section 511 ended up stripping them of standing. Id. at 661. I reproduce the court's discussion below, as the D.C. Circuit has said all there is to say about plaintiffs' attempt to circumvent section 511.

> [T]he average processing time does not cause affiants injury; it is only their processing time that is relevant. If, for example, affiants fell at the quick-processing end of a bell-shaped curve, a high average processing time would be irrelevant to them, and to reverse the analysis, a low average would not avoid injury if affiants were at the other end of the curve. In sum, assuming the alleged illegality—that the average processing time at each stage is too long—that "illegality" does not cause the affiants injury. And causation is a necessary element of standing.

> If the affiants were suing by themselves—which is how we must analyze the claim—asserting that the average time of processing was too long, it would be apparent that they were presenting a claim not for themselves but for others, indeed, an unidentified group of others. But one can not have standing in federal court by asserting an injury to someone else. It seems the district judge intuited this point by noting the claims were "not monolithic."

Id. at 662 (citations omitted). Although the quoted paragraphs focus on delays in processing disability compensation appeals, their reasoning extends to delays in providing mental health care. The D.C. Circuit explained that plaintiffs alleging average, non-individual delays are actually "presenting a claim not for themselves but for . . . an unidentified group of others." Id. Such allegations can't establish standing. Id. Like plaintiffs in the D.C. Circuit, plaintiffs here disavowed all individual injuries to their members—both actual and likely—and relied on evidence of average delays.[4] Thus, like plaintiffs in the D.C. Circuit, they lack standing to pursue their non-individualized claims. The majority's not just dead wrong; it creates a square circuit split on an issue that requires national uniformity.

_____

[4] It makes no difference that this is a "suit for prospective relief." Maj. op. at 35 n.16. Plaintiffs stated in their complaint that their claims were "divorced from the facts of any individual claim" before the VA, so they can't sue on behalf of veterans now being injured by the VA's alleged delays. Nor can they sue on behalf of veterans who have received medical care or whose claims have already been processed. See Vietnam Veterans of Am., 599 F.3d at 661 n.11. And they can't sue on behalf of veterans who haven't requested benefits from the VA because any injury there would be purely "conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).

**B.** <u>Alternative forum</u>: The majority compounds its error by holding that a "broad reading of § 511" would "deprive[ plaintiffs] of any forum in which to raise their claims" and thus contravene the Supreme Court's warning about "the constitutional danger of precluding judicial review of constitutional claims." Maj. op. at 84–85. The majority claims that the Veterans Court "lack[s] jurisdiction over the type of claims raised by" plaintiffs because: (1) constitutional challenges must be made "in the context of a proper and timely appeal" from a BVA decision, while plaintiffs have challenged delays before the BVA issues a decision; and (2) organizations can't present claims to the Veterans Court. <u>Id.</u> at 84. But the Sixth and D.C. Circuits addressed the exact same issues and concluded that the Veterans Court <u>could</u> adequately adjudicate veterans' claims that their benefits had been unreasonably delayed. <u>See</u> <u>Beamon</u>, 125 F.3d at 967–70; <u>Vietnam Veterans of Am.</u>, 599 F.3d at 659–60 & n.6.

The Veterans Court "has authority to reach constitutional issues in considering extraordinary writs [of mandamus]," which it may grant "when the claimant has demonstrated that he . . . has <u>no adequate alternative</u> means of obtaining the relief sought." <u>Beamon</u>, 125 F.3d at 969 (emphasis added) (quoting <u>Dacoron</u> v. <u>Brown</u>, 4 Vet.App. 115, 119 (1993)). This "power to issue writs of mandamus compelling VA officials to take action that has been unreasonably

delayed" extends to cases where "there has been <u>no final decision by the Board</u>." <u>Vietnam Veterans of Am.</u>, 599 F.3d at 659 n.6 (emphasis added) (citing <u>Erspamer</u> v. <u>Derwinski</u>, 1 Vet.App. 3, 6–9 (1990)). Individual veterans can bring their constitutional claims in the Veterans Court; should the court find a due process violation, it will issue a writ of mandamus ordering appropriate relief. Those veterans denied a writ can appeal their constitutional claim to the Federal Circuit. <u>See</u> <u>Nielson</u> v. <u>Shinseki</u>, 607 F.3d 802, 805 (Fed. Cir. 2010) ("[W]e have jurisdiction to review all legal questions decided by the Veterans Court."). Construing section 511 to preclude plaintiffs from bringing their claims in our court doesn't foreclose all relief.[5]

Nor should we trouble ourselves that organizational plaintiffs can't present constitutional claims in the Veterans Court. Congress has broad powers to shape the procedural rules and constitutional remedies available to veterans. <u>See</u>

_____

[5] Although the Sixth and D.C. Circuits addressed alleged delays in the VA's processing of disability claims, their analysis applies with equal force to claims that the VA unreasonably delayed needed mental health care. The Veterans Court can hear appeals of any issue raised before the BVA, and the BVA's governing regulations extend its appellate jurisdiction to "questions of eligibility for . . . benefits administered by the Veterans Health Administration," other than "[m]edical determinations" of the type that "an attending physician" might face. 38 C.F.R. § 20.101(b). Appointment scheduling decisions are not by any means medical determinations, so the BVA—and therefore the Veterans Court—have jurisdiction to review claims that such scheduling decisions violate due process.

Walters, 473 U.S. at 333–34; cf. Tietjen v. U.S. Veterans Admin., 884 F.2d 514, 515 (9th Cir. 1989) (construing section 511's predecessor to foreclose all review of claim that VA violated due process by ignoring its own regulations); Anderson v. Veterans Admin., 559 F.2d 935, 936 (5th Cir. 1977) (per curiam) (same for claim that hearing procedures violated veteran's constitutional rights). The majority actually points to Walters, where the Supreme Court recognized these broad powers, when it rejects plaintiffs' claim that veterans' constitutional rights were violated by the absence of a class action procedure in the VJRA. Maj op. at 98 ("Underlying all the procedural restrictions cited by [plaintiffs] is what the [Supreme] Court has already held to be the government's interest in the creation and preservation of a non-adversarial system."); see complaint ¶ 30. Because plaintiffs brought "this action as the representatives of their members . . . and as class representatives," organizational standing in our case would simply be a tool, like class actions, for vindicating individual members' interests. Complaint ¶ 38. If the absence of one tool doesn't render judicial review constitutionally inadequate, then, given the broad powers Congress has to shape veterans' remedies, the absence of the other shouldn't either.[6] And the Veterans Court's

---

[6] The majority misses the point entirely when it notes that organizational standing doesn't serve "precisely the same purpose" as a class action. Maj. op. at 85 n.35. Walters held that Congress could effectively deny veterans access to

holdings are binding on subsequent BVA and Veterans Court adjudications, so a ruling on one veteran's due process claim will have a systemwide effect. See Beamon, 125 F.3d at 970 (citing Lefkowitz v. Derwinski, 1 Vet.App. 439, 440 (1991) (en banc) (per curiam)).

**C.** The Price–Thomas Rule: The majority spends pages and pages creating circuit splits, but it never applies the correct test for determining our jurisdiction. Price and Thomas held that we lack jurisdiction if adjudicating a claim "would require the district court to determine first whether the VA acted properly in handling [the veterans'] benefits request[s]." Broudy, 460 F.3d at 115 (emphasis omitted) (quoting Thomas, 394 F.3d at 974 (quoting Price, 228 F.3d at 422)) (internal quotation marks omitted). This is the case for plaintiffs' mental health care and disability compensation claims, so even if plaintiffs had standing to bring these claims, we would lack jurisdiction over them.

Mental health care: The majority claims that "vast numbers of veterans are denied access to mental health care by administrators," and that the absence of "an

---

counsel without violating due process. 473 U.S. at 320, 326. The right to counsel is far more important to a litigant seeking to vindicate his rights than the option of bringing his claim through an organization. If Congress has broad enough powers to effectively deny veterans the former, then it can certainly deny them the latter.

appeals process to challenge appointment scheduling . . . violates the Due Process Clause by providing insufficient process." Maj. op. at 56, 67. The lack of an appeal can't be unconstitutional unless administrators schedule appointments in a way that actually deprives veterans of their statutory entitlement to mental health care: If there's no deprivation, there's no need for process. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972). This will depend on the facts of each veteran's case: An eight-week wait for an appointment constitutes a deprivation for a veteran who's pointing a gun at his head, but it may be acceptable for a veteran who's mildly depressed. And there can be no deprivation if the veteran caused the delay by rejecting earlier available appointments. Thus, there is simply no way to adjudicate the due process claim without "determin[ing] first" whether the VA's administrative staff "acted properly in handling" veterans' requests for appointments. Because plaintiffs' mental health care claim requires consideration of the VA's decisions on individual requests for benefits, the VJRA precludes us from reviewing it.

The majority brushes aside the VJRA's limits on our jurisdiction by construing a footnote in the VA's appellate brief to "acknowledge[] that" plaintiffs' purportedly systemic claims "fall[] outside the VJRA's jurisdictional bar." Maj. op. at 54–55. But the VA argued in district court that the VJRA does

preclude review of plaintiffs' mental health care claim. The supposed "acknowledgment" on appeal only pointed out that <u>plaintiffs</u> framed their claims generally. <u>See</u> VA Br. 33 n.7 ("[P]laintiffs cannot now criticize the district court for using a 'systemic' standard to assess delay when the generality of their own claims compelled this approach."). The VA didn't concede that the district court had jurisdiction over plaintiffs' mental health care claim, and it's wrong for a court to wring a concession from a party's ambiguous language. But it doesn't matter anyhow, because we have an "independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction." <u>Henderson ex rel. Henderson</u> v. <u>Shinseki</u>, 131 S. Ct. 1197, 1202 (2011).

The majority responds by arguing that the VA "has not issued a decision . . . that is final and conclusive and unreviewable." Maj. op. at 56 (emphasis and internal quotation marks omitted). But the VJRA's prohibition on judicial review isn't limited to final decisions. It extends to the VA's resolution of any "question[] of law [or] fact necessary to a decision by the [agency] under a law that affects the provision of benefits." 38 U.S.C. § 511(a). Decisions by administrative schedulers setting up mental health care appointments for veterans are fully covered by the VJRA's preclusive reach, and we lack jurisdiction over any claim that would

require a district court to review them.  See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; see also Broudy, 460 F.3d at 115.[7]

It makes no difference that Price and Thomas were "tort suit[s] brought by an individual veteran," while plaintiffs filed "a suit for an injunction."  Maj. op. at 57.  Like the claims in Price and Thomas, plaintiffs' claim is based on an allegation that the VA unjustifiably denied benefits to veterans—here, by taking too long to provide them with mental health care.  And when plaintiffs in Broudy requested an injunction, the D.C. Circuit still applied the Price-Thomas rule, although it concluded that the district court had jurisdiction over the particular claim there.  460 F.3d at 110, 115.  The majority's clumsy effort to avoid a conflict with Price and Thomas will not fly.

Disability compensation:  The district court concluded that section 511 barred plaintiffs' disability compensation claim because the issue of "whether a veteran's [disability] benefit claim adjudication has been substantially delayed will

---

[7] The majority seems to think that the "relevant 'decision' here . . . is whether the existing safeguards are constitutionally sufficient."  Maj. op. at 58. But that's the essence of plaintiffs' mental health care claim.  The VJRA strips us of jurisdiction over any claim that would require us to review any VA decision on a question of law or fact necessary to the agency's resolution of a benefits request. See p.14 supra.  Here, we'd have to review the decisions by VA administrative schedulers setting up mental health care appointments.

often hinge on specific facts of that veteran's claim." This is absolutely correct: The time the VA needs to adjudicate a claim depends on its complexity as well as the amount of evidence the VA needs to generate for the veteran, and PTSD claims are among the most complex and fact-intensive. We can't say whether a delay is unreasonable without "determin[ing] first" how much time the VA should have taken to process that veteran's disability compensation claim, and section 511 precludes us from making that determination. See Price, 228 F.3d at 422; Thomas, 394 F.3d at 974; see also Broudy, 460 F.3d at 115.

The majority rejects this conclusion because, supposedly, the VA hasn't "made a final decision in [plaintiffs'] members' appeals; that their appeals languish undecided is the very basis for their claim." Maj. op. at 80–81. But that's not right: Plaintiffs claim that most of the VA's unreasonable delays occur well before the BVA is able to rule on the veterans' appeals. See id. at 30–31; see also id. at 26–27 (BVA's time to issue a ruling represents less than a third of the VA's average delay in processing an appeal of a ratings decision). The VA's decisions before the appeal reaches the BVA are also final and nonreviewable, except through the VJRA's "specialized review process." Bates, 398 F.3d at 1364; see p.3 supra. Because we lack jurisdiction to review the decisions creating these alleged

delays, we can't determine whether the time the VA takes to process an appeal is unreasonable.

The majority clearly errs when it claims that "§ 511 does not grant exclusive jurisdiction to any agency or court over a class of legal claims, except challenges to 'decision[s]' . . . that have actually been made by the Secretary." Maj. op. at 81 (alteration in original) (emphasis omitted). Price, Thomas and Broudy held that section 511 grants the VA exclusive jurisdiction over any claim the district court can't decide without "determin[ing] first whether the VA acted properly in handling [the veteran's] benefits request." Thomas, 394 F.3d at 974 (quoting Price, 228 F.3d at 422); see also Broudy, 460 F.3d at 115. The very essence of plaintiffs' delay claim is that the VA so mishandled veterans' requests for benefits that it deprived them of a protected property interest. See maj. op. at 59, 91. We can't adjudicate this claim without evaluating whether the VA "acted properly" at each step in deciding the benefits requests.

The majority's citation to Broudy doesn't help them a bit. Plaintiffs there alleged that the VA's cover-up of radiation test results denied them access to the courts. Broudy, 460 F.3d at 109–10. They requested the "immediate release of all relevant records and documents," an injunction prohibiting any further cover-up, damages and related relief. Id. The D.C. Circuit held that it had jurisdiction over

this denial of access claim, which is again consistent with the Price-Thomas rule. See id. at 115. Plaintiffs weren't "asking the District Court to decide whether any of the veterans whose claims the Secretary rejected [were] entitled to benefits" or "to revisit any decision made by the Secretary in the course of making benefits determinations." Id. Because the court didn't need to determine whether the VA "acted properly in handling [a] benefits request," the VA didn't have exclusive jurisdiction. Id. (emphasis and internal quotation mark omitted).

Here, there's no way to adjudicate plaintiffs' due process claim without revisiting the VA's decisionmaking. See pp.17–18 supra. Broudy recognized that in such situations, the rule set out in Price and Thomas grants the VA exclusive jurisdiction. See 460 F.3d at 115. Rather than supporting the majority's position, Broudy actually undermines it.

The other case on which the majority relies—Hanlin v. United States, 214 F.3d 1319 (Fed. Cir. 2000)—is entirely inapposite. There, an attorney sued the VA for attorney's fees under a breach of contract theory. Id. at 1320. The Federal Circuit held that it had jurisdiction over his claim, which is fully consistent with the Price-Thomas rule. See id. at 1322. The attorney didn't challenge anything about the VA's underlying decision on his client's request for veterans' benefits. See id. at 1320–21. And the statute governing attorney's fees didn't force him to

pursue his claim through the VA's administrative process:  He had the option of suing in district court.  Id. at 1321–22; see 38 U.S.C. § 5904(d).  Section 511 therefore didn't "require the Secretary to address [the attorney's] claim and thus [did] not provide the VA with exclusive jurisdiction."  Hanlin, 214 F.3d at 1321.

Plaintiffs here represent veterans who could file their benefits claims only with the VA.  See 38 U.S.C. § 5101(a) ("A specific claim in the form prescribed by the Secretary . . . must be filed in order for benefits to be paid or furnished to any individual under the laws administered by the Secretary.").  When they did, the VA was required to address their claims and therefore acquired exclusive jurisdiction.  See Hanlin, 214 F.3d at 1321 ("[T]hrough the filing of a claim with the VA[], 38 U.S.C. § 511(a) imposes a duty on the Secretary to decide all questions of fact and law necessary to a decision in that case.").

## II

The majority creates a second conflict with the VJRA by installing a district judge as arbiter of whether the VA's appeals procedures violate due process.  The VA has already considered the process due to veterans[8] and promulgated

---

[8] See, e.g., Stressor Determinations for Posttraumatic Stress Disorder, 75 Fed. Reg. 39,843, 39,849 (July 13, 2010) (to be codified at 38 C.F.R. pt. 3) (rejecting claim that restriction on using private doctors to rebut VA determinations violates due process); Board of Veterans' Appeals: Obtaining

regulations establishing informal, nonadversarial appeals processes.  See Vietnam

Veterans of Am., 599 F.3d at 656.[9]  But the VJRA precludes review of VA

---

Evidence and Curing Procedural Defects Without Remanding, 67 Fed. Reg. 3099, 3101 (Jan. 23, 2002) (to be codified at 38 C.F.R. pts. 19 and 20) ("We think this time-tested approach will adequately serve the interests of veterans both in being heard and in receiving a prompt decision on appeal.  In sum, we believe we are protecting the important due process rights of all appellants."); Well-grounded Claims, 64 Fed. Reg. 67,528, 67,528 (Dec. 2, 1999) (to be codified at 38 C.F.R. pt. 3) (recognizing that "grave questions of due process can arise if there is apparent disparate treatment" in the VA's "volunt[eering of] assistance" to claimants); Compensation for Certain Undiagnosed Illnesses, 60 Fed. Reg. 6660, 6663 (Feb. 3, 1995) (to be codified at 38 C.F.R. pt. 3) ("[T]hose sections of the regulations also provide for a 60-day predetermination period . . . in order to safeguard a veteran's due process rights."); Appeals Regulations; Rules of Practice, 54 Fed. Reg. 34,334, 34,342 (Aug. 18, 1989) (to be codified at 38 C.F.R. pts. 14, 19 and 20) (explaining that appeal certification "ensure[s] that the appeals development procedures have been adequate, particularly as they affect the [veteran's] due process rights").

[9] The VA's regulations, which must be construed to "secure a just and speedy decision in every appeal," 38 C.F.R. § 20.1, provide far more help to individual veterans than do our circuit's rules of appellate procedure.  A veteran may initiate an appeal by filing a "written communication . . . expressing dissatisfaction or disagreement" with the rating decision "and a desire to contest the result." Id. §§ 20.200, 20.201.  The VA "must reexamine the claim and determine whether additional review or development is warranted." Id. § 19.26(a).  The veteran can also ask to have the rating decision reviewed by a more senior VA official. Id. § 3.2600(a).  If the VA concludes after initial review that the rating is correct, it must "prepare a Statement of the Case" that "must contain" a summary of the evidence and applicable laws, "with appropriate citations," and the reason for the denial of benefits. Id. §§ 19.26(d), 19.29.  The VA will then send the Statement of the Case to the veteran, who can use it to file a more detailed "Substantive Appeal" of the VA's decision. Id. §§ 19.30(a), 20.202.  The final step before the BVA begins its review is for the Regional Office to certify the veteran's appeal. Id. § 19.35.  Certification "primarily functions as a check list for the [VA] to insure [sic] that all appeal processing procedures have been completed."

regulations anywhere but in the Federal Circuit.  See 38 U.S.C. § 502; Preminger

v. Principi, 422 F.3d 815, 821 (9th Cir. 2005).  The district court can't review the

VA's procedures without also reviewing its regulations, and it therefore lacks

jurisdiction to carry out the majority's marching orders.

The majority vainly attempts to distinguish section 502 by characterizing

plaintiffs' claims as challenges to "the VA's actual conduct," and "not its codified

rules."  Maj. op. at 78 (emphasis omitted); see id. at 77–78 ("[Plaintiffs] challenge

. . . only the VA's failure to discharge its duty to veterans in a short enough time to

avoid depriving them of their property interest without due process.").  This is a

distinction without a difference:  Were the district court to order the VA to engage

in or cease a certain course of conduct, the VA would have to conform its

regulations to the district court's order.  See Nehmer v. U.S. Dep't of Veterans

Affairs, 494 F.3d 846, 860 (9th Cir. 2007) ("[T]he VA cannot usurp the power of a

district court to construe the provisions of an order it has issued . . . simply by

issuing a regulation interpreting that order or declining to follow it.").  Had

plaintiffs "solely challenged the VA's non-regulatory failure to act," the district

court and our court might have jurisdiction.  See id. at 858.  But they didn't:  They

---

Appeals Regulations; Rules of Practice, 57 Fed. Reg. 4088, 4091 (Feb. 3, 1992) (to
be codified at 38 C.F.R. pts. 14, 19 and 20).

challenged conduct that the VA's existing regulations either permit or require. Their suit is a direct challenge to the regulations themselves and therefore barred by section 502.

### III

Even if we had jurisdiction, plaintiffs' due process claims would fail on the merits. The Supreme Court explained in Walters v. National Association of Radiation Survivors that the due process balancing test must accommodate Congress's strong, centuries-old interest in administering veterans' benefits in a manner that's "as informal and nonadversarial as possible." 473 U.S. at 323; see id. at 326 ("[U]nder the Mathews v. Eldrige analysis great weight must be accorded to the Government interest at stake here."); see also Nat'l Ass'n of Radiation Survivors v. Derwinski, 994 F.2d 583, 588–89 (9th Cir. 1992) (concluding that "in passing the [V]JRA Congress reaffirmed the government's interest"). Installing a judge as overseer of the VA's appeals procedures will unquestionably harm that interest: Plaintiffs must therefore make "an extraordinarily strong showing of probability of error under the present system . . . to warrant a holding that [a VA procedure] denies claimants due process of law." Walters, 473 U.S. at 326. Plaintiffs fail to clear this high hurdle.

**A.** <u>Mental health care</u>: The majority claims that veterans "placed on waiting lists by administrators" are denied their statutory entitlement to timely medical care. Maj. op. at 67. Because "<u>no</u> procedure is in place to ensure that mental health appointments are provided soon enough to be effective," the "marginal value of 'additional' procedural safeguards is extraordinarily high." <u>Id.</u> at 65. But Dr. Murawsky, a VA Chief Medical Officer, testified about several such existing safeguards; the district court credited this testimony. Because the majority misunderstands this evidence, I summarize those safeguards below.

The VA's most important safeguard protects any veteran who "shows up at a medical center . . . and expresses suicidal intentions." He will be "evaluated by a nurse and then would be seen in the emergency department by a physician." Should the veteran come to a VA clinic, he'll "be shown to a doctor"; if he speaks "to a non-medical personnel, then . . . they would refer [the veteran] to a nurse" and "[m]ight bring the [veteran] to the emergency department or to the mental health center" at the clinic. The VA conducts "secret shopper" tests where actors posing as suicidal veterans test clinic compliance with the immediate-treatment policy.

Nor does the veteran need to "walk[] into a VA emergency room or clinic," as the majority claims. Maj. op. at 66. Dr. Murawsky explained that if a veteran calls up and expresses a need for care:

> A number of things could happen. The [veteran] could be referred directly to the [VA's] suicide hotline, the 800 number that's set up by the VHA. The individual could be transferred to a nurse or a provider to speak to that individual and determine what is happening at that time. . . . [I]f it's nighttime . . . . [the] call is directed to [a VA] call center, where an RN [registered nurse] will answer the line directly, take a patient's concern and complaint, and then make a decision on . . . calling a provider on call or taking care of the—whatever happens to be the need immediately.

Thus, veterans who can't make it to a clinic can reach a medical professional at any time.

The majority entirely ignores the VA's national 24/7 suicide prevention hotline. In its first six months, this hotline received 26,000 calls and referred 2,000 veterans to a Suicide Prevention Coordinator. The VA reported that its hotline received 260,000 calls and recorded its 10,000th rescue after only three years of operations. Dep't of Veterans Affairs, FY 2010 Performance and Accountability Report at I-15 [hereinafter "VA Report"].[10] VA's National Suicide Prevention Coordinator described these callers as:

---

[10] The VA's annual report is an official document that the Secretary prepares and submits to the President and Congress. VA Report at I-1.

> [P]eople who call us but they've already taken pills, or they have a gun in their hands, or they're standing on a bridge. . . . These are the calls where we can't wait. We call emergency services right away. . . . [T]his one call is their last resort.

Id. The hotline is an effective tool for delivering care to veterans who are unwilling or unable to come to a clinic, or who suffer a crisis before their scheduled appointment.

Veterans who don't need emergency care are protected by a policy set out in the Feeley Memo requiring that "those individuals who either self request [a mental health appointment] or were consulted for mental health . . . have an initial evaluation within 24 hours and . . . be seen within 14 days of that initial evaluation." Dr. Murawsky testified that his facilities met the 24-hour rule "about 60 to 80 percent" of the time and "do very well with the 14 day access component," with most delays "based on the veteran's choice: work schedules, family needs." The majority focuses on the fact that the "VA lacks any method to ensure compliance" with these policies systemwide, maj. op. at 69, but plaintiffs didn't produce evidence that the VA failed to follow the policy. The evidence in the record showing longer wait times is from May 2007, one month before the Feeley Memo was issued. There is no evidence that most veterans aren't seen within 24 hours after they initiate a request or consultation.

The majority also seems to think that administrative schedulers control the timing of veterans' mental health care appointments. See id. at 65–66 ("[V]eterans whose delayed care stems from administrative decisions have no right . . . to insist that they be evaluated by a medical professional . . . ."). Not true. Plaintiffs' lawyer proposed the following hypothetical to Dr. Murawsky:

> If a veteran shows up to one of your clinics and says, "Well, I'm not feeling too well, I think I need to speak to someone," and if the person there tells them, "Well, we don't have any appointments right now, why don't you come back in six weeks," what is the veteran to do?

Dr. Murawsky testified:

> That wouldn't happen. As far as I'm aware, I have not heard any incidents of that happening. What you describe is a clerk making a medical decision. . . . That [veteran] would be referred to a nurse who could triage the patient and make a determination of whether they were medically safe or psychiatrically safe. (Emphasis added.)

Plaintiffs never rebutted this testimony.

The majority gets the order of events backwards: Medical staff see the veteran first, and only then does he speak to an administrative scheduler to set up an appointment within the time determined to be appropriate by the medical professional. As the quoted paragraphs indicate, administrative staff do not turn away veterans who want to speak with medical personnel. None of the "examples"

or "stor[ies]" the majority cites come anywhere near proving that administrative

staff deny needed care to veterans.[11]

_____

[11] Plaintiffs provided eight redacted declarations by veterans suffering from PTSD or friends and family of veterans who committed suicide. The majority cites two of these, but neither actually states that administrative scheduling staff denied medical care. Contra maj. op. at 67. In one, the veteran went to the emergency room but decided not to check in after "a veteran in the waiting room told me that [it] was full of hardcore drug-addicts." Veteran 1 Decl. ¶ 14 (name redacted in the record). The veteran later fired two VA psychiatrists: the first because she stopped prescribing him a highly addictive sleep aid, and the second because she didn't read the first psychiatrist's notes. Id. ¶¶ 18–19. The second veteran committed suicide after being denied inpatient treatment at a VA hospital because "there were no beds available"; one "staff member" said "he didn't have time to see" the veteran that day but he "should call back the next day." Mother 1 Decl. ¶¶ 8–10 (name redacted in the record). The VA's failure to provide care to the veteran was due to a lack of medical resources, not the actions of an appointment scheduler.

One of the declarants described his care as "helpful" and stated that his VA counselor helped him avoid suicide. Veteran 2 Decl. ¶¶ 10, 13. Three of the other declarants described denials of care by medical staff. Here's what they said, with names redacted in the record and emphasis added: "The VA doctors failed to acknowledge . . . my brother's behavior and suicidal intent . . . and failed to make every effort to treat the cause of his condition." Sister 1 Decl. ¶ 19. "[H]e was prescribed medications and allowed to see a therapist once per month." Girlfriend 1 Decl. ¶ 4. "[T]he Marine Corps doctors would not order an MRI or a CAT Scan, . . . and only gave him narcotic pain medications . . . ." Brother 1 Decl. ¶ 13. One veteran was unhappy with the frequency of his appointments and his care-givers' qualifications, but he didn't state that a VA administrator denied him more frequent appointments. See Veteran 4 Decl. ¶ 10. And the other declarant did fall through the cracks and waited many months for mental health care, but he also didn't claim that a VA administrative staffer denied a request for an earlier appointment. See Veteran 3 Decl. ¶¶ 15–19. In none of these examples did a VA administrative scheduler deny a veteran's request for mental health care.

Dr. Murawsky testified that because a veteran who shows up at a clinic will have "spoke[n] to a nurse," he "would have had a medical triage or a decision made." Should the veteran disagree when the nurse tells him, "'You are . . . safe to wait' for however long it might be, . . . then the veteran has the right to appeal that decision" by saying, "I want an earlier appointment." (Internal quotation marks omitted.) This is essentially the same as saying, "I disagree with the decision that it's okay for me to wait; I'm not all right." (Internal quotation marks omitted.)

Veterans don't even have to file an appeal themselves; they can seek the help of a Patient Advocate, who will champion their cause within the VA. As anyone who's been to the hospital recently knows, having such an advocate can be invaluable. The VA's Patient Advocates are either onsite or reachable by phone; they will appeal the nurse or doctor's decision up the chain of command, and, according to VA policy, senior medical staff must respond "within seven calendar days . . . to a patient complaint." If the veteran disagrees with the response, he can continue to appeal, asking for a third opinion, and the doctor giving that opinion may bring in a non-VA specialist.

Creating additional processes for reviewing administrative scheduling decisions would be pointless. Veterans who require immediate care can walk into a clinic, tell a medical professional how they feel over the phone or call the 24/7

suicide hotline. See p.26 supra. Veterans who don't need immediate care and request their first mental health care appointment are protected by the Feeley Memo's policy that they receive an initial evaluation within twenty-four hours and be seen within fourteen days of that evaluation. See p. 27 supra. And for ongoing care, administrative schedulers set appointments within the time determined to be safe by the medical staff. Contra maj. op. at 66–67. If a medical professional says it's OK to wait six weeks, it makes no difference whether the appointment scheduler sets up an appointment in two weeks or four.

The majority claims that schedulers routinely set up appointments that deviate from the doctor or nurse's medical assessment, but the only evidence it cites are a 2005 report on the VA's progress in implementing several PTSD treatment programs and a 2007 audit of the VA's general outpatient waiting times. Id. at 68–69. The 2005 PTSD treatment report didn't address administrative scheduling and is six years out of date, in any event. The 2007 audit has no data or conclusions on mental health wait times. It "reviewed a non-random sample of 700 appointments with . . . reported waiting times of 30 days or less" and concluded that schedulers' incomplete record-keeping and "some 'gaming' of the scheduling process" for electronic waiting lists rendered unreliable the VA-

collected data on waiting times and the number of patients on such waiting lists.[12]

This proves at most that large systems involving many participants are subject to occasional glitches; it comes nowhere near proving that administrative schedulers systematically delay veterans' mental health care treatment beyond the maximum wait time determined by a medical professional.[13]

The VA has rolled out multiple, overlapping safeguards to ensure that veterans receive necessary mental health care. The evidence shows that these safeguards, while not perfect, work reasonably well. Plaintiffs have failed to show that current procedures create an "extraordinarily strong showing of probability of error." Walters therefore precludes us from finding a due process violation.

---

[12] The audit found that, due to differences between the appointment date requested by the nurse or doctor and the actual appointment date shown in the VA's systems, waiting times were overreported in 25 percent of appointments and underreported in 47 percent of them. The VA claimed that most of these differences could "be attributed to patient preference for specific appointment dates that differ from the date recommended by medical providers." But because schedulers often failed to note in the VA's systems that the veteran had requested a different date, the auditors couldn't verify the VA's claim. The differences were "unexplained," maj. op. at 68, only because the VA couldn't produce such notations.

[13] The majority also quotes a fragment of the introduction to the 2007 audit describing an earlier 2005 audit of outpatient waiting times. See maj. op. at 68. That audit has the same flaws as the 2007 audit and is equally unhelpful. See generally Dep't of Veterans Affairs, Office of Inspector General, No. 04-02887-169, Audit of the Veterans Health Administration's Outpatient Scheduling Procedures (2005).

**B.** <u>Disability compensation</u>: The majority is "particularly doubtful" that "<u>any</u> government interest could justify" the average delays in adjudicating veterans' disability claims. Maj. op. at 89 (emphasis added). But <u>Walters</u> holds that we must accord "considerable leeway to" Congress's judgment that existing procedures adequately protect veterans against the risk of erroneous deprivation. 473 U.S. at 326. Congress hasn't been shy about imposing rules on the VA to address perceived failures in processing disability benefits. <u>See</u> <u>Nehmer</u>, 494 F.3d at 849 (discussing Congress's enactment of legislation simplifying the claims process for Agent Orange-connected ailments); <u>see also</u> 38 U.S.C. § 1112(b) (former POWs); <u>id.</u> §§ 1112(c) (radiation); <u>id.</u> §§ 1117–18 (Gulf War veterans' illnesses). But it imposed no such rules on mental health-related disability benefits, nor did it impose any statutory deadline on the VA's processing of appeals.

Congress recently had an opportunity to tighten control over the VA's administration of mental health disability benefits when it passed the Veterans' Benefits Act of 2010, Pub. L. No. 111-275, 124 Stat. 2864. But it didn't: The Act relaxes only the rules for compensating disabilities caused by a Traumatic Brain Injury (TBI). <u>Id.</u> § 601(b), 124 Stat. at 2884. TBI is commonly linked to PTSD and depression; that Congress specifically addressed one but not the other is strong

evidence that Congress doesn't want us to impose our own remedies.  See Heckler v. Day, 467 U.S. 104, 111–12 (1984).

When Congress has "committed the timing of hearings and reviews to the discretion of the" agency, "courts should be hesitant to require [additional procedures]."  Wright v. Califano, 587 F.2d 345, 353 (7th Cir. 1978).  That's particularly true where, as here, the delays are systemwide and "the result of a tremendous explosion in the number of claims that have had to be processed."  Id.; see maj. op. at 11.  Congress already exercises vigorous oversight of the VA through its ability to hold hearings on the agency's operations.  See Dep't of Veterans Affairs, VA Testimony before Congressional Committees, http://www.va.gov/oca/testimony/testimony_index.asp (last visited Mar. 26, 2011) (collecting House and Senate testimony by VA officials).  Because Congress is already actively involved in the agency's affairs, "programmatic improvements" should be made "in the offices of the [VA] or the halls of Congress," not through litigation.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990); see also Heckler v. Campbell, 461 U.S. 458, 466–67 (1983).[14]

_____

[14] This litigation wouldn't be possible without the reports Congress ordered the VA and GAO to produce, such as the 2007 waiting time audit, the 2005 PTSD implementation report and the May 2007 report on mental health waiting times. And Congress can and does subpoena executive agency documents when there's a concern that the executive branch is hiding important information.  See Josh

The majority's judicial adventurism is exceedingly troubling because the VA is no ordinary agency:  It provides medical care to over 5.8 million patients and pays pension and disability benefits to approximately 4 million people.  VA Report at I-24.  It employs hundreds of thousands, spends more than $100 billion a year, and has numerous responsibilities above and beyond mental health disability compensation.[15]  Id. at I-27.  These responsibilities require the VA to make tough decisions on how to allocate its resources.  We lack the institutional competence to revisit these decisions and "the many variables involved in the proper ordering of [the agency's] priorities."  Heckler v. Chaney, 470 U.S. 821, 831–32 (1985).

The majority's instructions on remand illustrate the folly of its due process holding.  The district court must "conduct evidentiary hearings in order to determine what procedures would remedy the existing due process violations in the [VA's] claims adjudication process" and "explore what procedural protections are most appropriate to permit the appeals of veterans to be expedited in the most

Chafetz, Executive Branch Contempt of Congress, 76 U. Chi. L. Rev. 1083, 1132–43 (2009).  It's the majority that "gets political reality exactly backwards."  Maj. op at 59 n.27.

[15] The VA in its last fiscal year provided services to 90,000 homeless veterans, paid education benefits to hundreds of thousands of service members, reservists and family members, managed 7 million life insurance policies, paid for vocational rehabilitation for 107,000 people, guaranteed 314,000 housing loans and maintained just over 3 million graves.  VA Report at I-3, I-7, I-24.

efficient manner." Maj. op. at 94. But the district court already held a four-day preliminary injunction hearing and a seven-day trial; together, these generated 2230 pages of transcripts. The parties prepared well over a thousand exhibits, and the district court admitted over a hundred of them at trial. I can't imagine what new evidence there is for the district court to discover or how it will order systemwide changes to the VA's adjudicative and administrative processes.

*     *     *

The majority dramatically oversteps its authority, tearing huge gaps in the congressional scheme for judicial review of VA actions. It overrules both Congress's and the VA's judgment on the amount of process due to veterans seeking benefits. And it rearranges the VA's organizational chart by appointing a district judge to head the agency. Congress enacted the VJRA to beat back the last judicial power-grab targeted at the VA. Unless corrected, today's decision will surely prompt Congress to pass a new "VJRA Restoration Act" to rein in the majority.